The UNITED STATES

v.

SOUTHERN UTE TRIBE OR BAND
OF INDIANS.

Appeal No. 7–66.

United States Court of Claims.
March 20, 1970.

W. Braxton Miller, Washington, D. C., with whom was Asst. Atty. Gen. Shiro Kashiwa, for appellant.

Glen A. Wilkinson, Washington, D. C., attorney of record for appellees. Wilkinson, Cragun & Barker, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

NICHOLS, Judge.

This case comes to us on appeal from a decision of the Indian Claims Commission which, in an interlocutory order dated May 16, 1966, found the appellant, the United States, liable to the appellee, the Southern Ute Tribe or Band, for (1) just compensation for taking 230,547.44 acres of land, and for (2) a "further and complete" accounting for funds held in trust. Although notice of appeal was filed on August 4, 1966, after briefing and oral argument we remanded to the Commission for supplemental findings of fact. Upon making the requested findings the Commission again transmitted the case to us, whereupon the parties, relying on earlier submitted briefs, again presented oral argument. Since the Commission's supplemental findings tended to support its original decision, the issues now on appeal are those previously posed.

The Southern Utes, an incorporated tribe composed of the Moache and Capote bands, allege that the United States violated a treaty agreement made with their ancestors and ratified by Congress in 1895. Briefly, the terms of the treaty, which are not in dispute, provided that the western sector of the Southern Ute reservation be set aside for all those who would not accept allotments in severalty. The eastern sector was for Southern Utes who would accept allotments.

The unallotted lands in this latter sector were to be opened to white settlers for the cash price of not less than $1.25 per acre. All proceeds, save certain offsets, were to be held by defendant in trust for the exclusive benefit of the Southern Utes. In April 1899, these lands were officially opened to public entry (31 Stat. 1947). In May 1900, however, Congress passed the Free Homestead Act (31 Stat. 179, 43 U.S.C. § 179) which allowed settlers to obtain this land without monetary consideration. The Southern Utes now seek just compensation for 230,547.44 acres of their land that defendant thus donated to homesteaders in violation of the 1895 treaty. Defendant's primary defense is that all claims relating to these free land dispositions have been settled finally by prior adjudication. We disagree with this contention for the reasons stated in the following discussion and analysis.

In the mid-1800's, the Ute Indians occupied an extensive region which spanned western Colorado, northern New Mexico and Utah. On March 2, 1868, these Indians—the Tabequache, Moache, Capote, Weeminuche, Yampa, Grand River and Uintah Bands of Utes—ceded their aboriginal lands to the United States in exchange for a 15.7 million acre reservation situated wholly within the boundaries of Colorado. (Treaty of 1868, 15 Stat. 619, 2 Kappler 990). Subsequently, the bands came to be known under different names: The Tabequaches were called the Uncompahgre Utes; the Moache, Capote *and* Weeminuche, the Southern Utes; and the Yampa, Grand River and Uintah, the White River Utes. Collectively these three Bands were informally organized and styled as the Confederated Bands of Utes.

Some years after the Treaty of 1868 another agreement was forged—the Brunot Cession of 1873. (18 Stat. 36, 1 Kappler 151). The discovery of large and valuable mineral deposits on the Ute Reservation had prompted the United States to persuade the Confederated Bands to cede 3.7 million acres of the east-central portion of their reservation. The relevance of this agreement lies in the geographical consequences it effected. (For convenience, in referring to these geographical sectors we will use the Royce Area numbers taken by the parties from Charles C. Royce's Map of of Colorado (1) Indian Land Cessions (18th Ann.Rep., B.A.E. 1896–1897, Part II)). By carving out this slice of land (Royce Area 566), the cession nearly severed the original 1868 reservation into two disproportionate parts. Royce Area 616, the larger part, lay mostly north of 566, but a corridor 20 miles across ran north and south between 566 to the east and Utah to the west. Wedged between the New Mexico border and the southern boundary of the Brunot Cession, however, was the remainder of the reservation (Royce Area 617). This narrow strip, 15 miles across, ran from the reservation's eastern boundary to a point just 20 miles short of the Utah border, its western boundary. The occupants of Royce Area 617 were and still remain the Moache, Capote and Weeminuche Bands, then known as the Southern Utes.

By another agreement ratified by the Act of June 15, 1880 (21 Stat. 199, 1 Kappler 180), the Confederated Bands ceded, or purported to cede, with certain exceptions, the remainder of their diminished 1868 reservation. Because of the critical importance of this cession, we quote the pertinent sections verbatim.

\*    \*    \*    \*    \*    \*

The \* \* \* chiefs and headmen of the confederated bands of Utes \* \* \* agree and promise to use their best endeavors with their people to procure their consent *to cede to the United States all the territory of the present Ute Reservation in Colorado, except* as hereinafter provided for their settlement.

*The Southern Utes agree to remove to and settle upon the unoccupied agricultural lands on the La Plata River, in Colorado; and if there should not be a sufficiency of such lands on the La Plata River and in its vicinity in Colorado, then upon such other un-*

*occupied agricultural lands as may be found on the La Plata River or in its vicinity in New Mexico.*

The Uncompahgre Utes agree to remove to and settle upon agricultural lands on Grand River, near the mouth of the Gunnison River, in Colorado, if a sufficient quantity of agricultural land shall be found there, if not then upon such other unoccupied agricultural lands as may be found in that vicinity in the Territory of Utah.

The White River Utes agree to remove to and settle upon agricultural lands on the Uintah Reservation in Utah.

\*     \*     \*     \*     \*     \*

The said chiefs and headmen of the confederated bands of Utes promise to obtain the consent of their people to the cession of the territory of their reservation as above on the following express conditions:

First.   That the Government of the United States cause the lands so set apart to be properly surveyed and to be divided among the said Indians *in severalty* \*   \*   \*.

\*     \*     \*     \*     \*     \*

Second.   That so soon as the consent of the several tribes of the Ute Nation shall have been obtained to the provisions of this agreement, the President of the United States shall cause to be distributed among them in cash the sum of sixty thousand dollars of annuities \*   \*   \*, and so much more as Congress may appropriate for that purpose; and that *a commission shall be sent to superintend the removal and settlement of the Utes,* and to see that they are well provided with agricultural and pastoral lands sufficient for their future support, and upon such settlement being duly effected, that they are furnished with [other necessities], and that the money to be appropriated by Congress for that purpose shall be apportioned among the different bands of Utes in the following manner:

One-third to those who settle on the La Plata River and vicinity [*the Southern Utes*]; one-half to those settling on Grand River and vicinity [Uncompahgre Utes], and one-sixth to those settling on the Uintah Reservation [the White River Utes].

Third.   That in consideration of the cession of territory to be made by the said confederated bands of the Ute Nation, the United States, in addition to the annuities and sums for provisions and clothing stipulated and [otherwise provided by law or treaty], agrees to set apart and hold, as a perpetual trust for the said Ute Indians, a sum of money, or its equivalent in bonds of the United States, which shall be sufficient to produce the sum of fifty thousand dollars per annum, which sum of fifty thousand dollars shall be distributed per capita to them annually forever.

Fourth.   That as soon as the President of the United States may deem it necessary or expedient, the agencies for the Uncompahgres and Southern Utes be removed to and established at suitable points, to be hereafter selected, upon the lands to be set apart, and to aid in the support of the said Utes until such time as they shall be able to support themselves, and that in the mean time the United States Government will establish and maintain schools in the settlements of the Utes, and make all necessary provision for the education of their children.

Fifth.   [Prior treaties are reaffirmed.]

\*     \*     \*     \*     \*     \*

Sec. 2.   [Five Commissioners were authorized to present the agreement to the Utes for their ratification, and upon ratification to assess improvements and take a *census* of the Southern Utes, Uncompahgre Utes, and White River Utes].   \*   \*   \*   [A]nd they [commissioners] shall also select lands and allot them in severalty to said Indians, as herein provided, and

superintend the removal, location, and settlement of the Indians thereon, and do and perform such other services as the Secretary of the Interior may consider necessary for them to do in the execution of the provisions of this act.

\*    \*    \*    \*    \*    \*

Sec. 3. *That the Secretary of the Interior be* \* \* \* *authorized to cause to be surveyed, under the direction of said commissioners, a sufficient quantity of land in the vicinities named in said agreement, to secure the settlement in severalty of said Indians as therein provided.* And upon the completion of said survey and enumeration herein required, the said commissioners shall cause allotments of lands to be made to each and all of the said Indians, in quantity and character as set forth in the agreement \* \* \* and whenever the report and proceedings of said commissioners \* \* \* are approved by the President \* \* \*, he shall cause patents to issue to each and every allotee for the lands so allotted, with the same conditions, restrictions and limitations mentioned therein as are provided in said agreement; and all the lands not so allotted, the title to which is, by the said agreement of the confederated bands of the Ute Indians, *and this acceptance by the United States, released and conveyed to the United States, shall be held and deemed to be public lands of the United States and subject to disposal under the laws providing for the disposal of the public lands,* at the same price and on the same terms as other lands of like character, except as provided in this act: *Provided,* That none of said lands, whether mineral or otherwise, shall be liable to entry and settlement under the provisions of the homestead law; *but shall be subject to cash entry only in accordance with existing law; and when sold the proceeds of said sale shall be first sacredly applied to reimbursing the United States for all sums paid out or set apart under this act by the government for the benefit of said Indians, and then to be applied in payment for the lands at [$1.25] per acre which may be ceded to them by the United States outside of their reservation, in pursuance of this agreement. And the remainder, if any, shall be deposited in the Treasury as now provided by law for the benefit of the said Indians, in the proportion hereinbefore stated, and the interest thereon shall be distributed annually to them in the same manner as the funds provided in this act:* \* \* \*. (Emphasis supplied throughout, except usual statutory italics.)

\*    \*    \*    \*    \*    \*

The most significant aspects to be gleaned from this Act, with respect to our analysis, is that the Confederated Bands (Southern Utes included) seemed to cede their *entire* Colorado reservation—Royce Area 616 *and* 617—and moreover promised to accept allotments in severalty in various sectors within and beyond reservation boundaries. As sole consideration for these promises, the Bands were to receive shares in the proceeds of unallotted land sales remaining after certain Government reimbursements. The Southern Utes were apportioned a one-third share and like their confederates understood that such monies would be held by defendant in trust for their benefit. The Commission found that the Act of 1880 "reserved" Royce Area 617 for the Southern Utes. Although the plain language of the Act appears inconsistent with this finding, the following sequence of events capped by the Act of 1895 and Restoration of 1938 (both discussed *infra*) support the conclusion that plaintiffs at any rate did not cede their reservation (Royce Area 617) under the agreement of 1880.

Pursuant to the above act the Ute Commission was formed under the leadership of chairman George W. Manypenny. On November 21, 1881, the Commission submitted its report to the Secretary of the Interior (H.R. Doc., Vol. 10, Ser. No. 2018, 47th Cong., 1st Sess. 383 (1882)). Divided into three sub-

reports, one for each band in the confederated trio, the report discloses that the removal of the Uncompahgre and White River Utes was not accomplished without some difficulty. Both bands, despite the terms of the above treaty, resisted removal with vehemence. Finally, however, they were persuaded to settle in Utah, outside the bounds of their former reservation. The Southern Utes, on the other hand, were to receive different treatment as forecast by the comments of Chairman Manypenny:

\*   \*   \*   \*   \*   \*

When I went to the Southern [Ute] Agency, I found the prevailing opinion was that all the Southern Utes by the terms of the [1880] agreement were to be removed to and located on the La Plata River in Colorado and New Mexico. It was confidently expected that in a brief time the valleys of the Animas, Florida, and Las Pinos, &c., would be open to occupation and settlement by white people. The settlers in these valleys north of the reservation were impatient to enter and possess the land; and when it became known that I had instructed the contractors for surveying, on the completion of their work on the La Plata to pass over to and commence work on the Animas and Florida, there was not only disappointment, but great dissatisfaction manifested. It was asserted that I had deliberately perverted the language of the [1880] treaty and committed a great wrong.

Under the terms of the agreement there was no other land in Colorado that I could have selected upon which to locate these Southern Utes. This I regard as a great misfortune, since their close proximity to the white settlements in the valleys of the streams on which they are to be located will subject the Utes, after their lands are assigned to them and patents issued, and the residue of the lands are opened to occupation and settlement, to constant annoyance by evil-disposed persons.

\*   \*   \*   \*   \*   \*

\*   \*   \* During my stay on the reservation I took occasion  \*   \*   \*  to talk to the leading men  \*   \*   \*  on the subject of their location in severalty. In these conversations I called their attention to the fact that the work the surveyors were doing was the preliminary step to such location [in severalty] and the placing of each family on its own land. On many occasions all that I said was listened to without a single word in response, and I did not find one who desired a house, or would agree to dwell in one if built for him on his own land. It will take time and careful management to induce these Indians to abandon their present [way of living] and adopt the new mode of life contemplated by the agreement.

In the meantime, and while the change is going on, they must be protected from annoyance. Intruders must be prevented from going in among them. If this be not done disorder will eventually reign, and all efforts to domesticate them will fail. *To prevent intrusion and guarantee proper order and protection, I can see no other way than to so modify the [1880] agreement, so far as these Indians are concerned, as to maintain the exterior lines of the strip of land one hundred miles long and fifteen wide, and preserve all the land within these lines for an indefinite period as an Indian reservation, and let the United States laws in relation to Indian reservations have full force therein. Then the land selected, and upon which the Indians are to be located, can be kept free from intruders.* Id. at 393. (Emphasis supplied).

Although we stated earlier that the plain words of the 1880 treaty seemed to indicate that the Southern Utes agreed to cede their lands to the United States, Manypenny's recitals give us some pause. They show that both sides regarded the 1880 agreement as not in effect as to the Southern Utes, pending further meas-

ures. By suggesting that the reservation be closed to public entry indefinitely, Manypenny impliedly suggests that the United States forego, albeit not permanently, its rights under the 1880 treaty vis a vis the Southern Utes. Significantly, Manypenny's recommendation to modify the 1880 treaty was accepted by the full commission. The record contains, however, no official acknowledgement or response.

Consequent to the departure of the Uncompahgre and White River Utes from Royce Area 616, Congress promulgated the Act of July 28, 1882 (22 Stat. 178), which declared all of Royce Area 616 as public land to be disposed of in accordance with the Act of 1880. Section 2 of the Act of 1882 provided, however, that the Secretary of the Interior "at the earliest practicable day, ascertain and establish the line between [Royce Area 616 and the land] now or lately occupied by the Southern Utes * * *." Five hundred dollars was appropriated for this survey. Section 3 provided among other things that the land opened in Royce Area 616 would only be disposed of on a cash basis not less than $1.25 per acre.

Plaintiff argues that by section 2 of the above act the United States formally recognized the thin strip of land (Royce Area 617) as the exclusive reservation of the Southern Utes. Defendant explains this survey as merely an attempt to cordon off the Southern Utes' land "until they could be located in severalty."

To implement the Act of 1882 the Secretary of the Interior was obligated to instruct the district land offices in Royce Area 616 how to accomplish disposal. From the text of a letter dated August 4, 1882, which ostensibly was sent out for the purpose under the approval of the Secretary of the Interior (Report of the Sec. of Int., Vol. 1, H.R. & Sen. Message & Doc., 47th Cong., 2d Sess. 41 (1882)), we have the following:

 *  *  *  *  *  *

The second section of the act of 1882 provides for a survey of the line between the lands occupied by the Southern Utes and the Ute lands exposed to entry by the act [of 1882]. The following is a description of the line which is laid down on said map: Commencing *at* the southwest corner of the Ute *ceded* lands; thence extending the south *boundary* of the Ute *ceded* lands to the western boundary of the State of Colorado. (Emphasis supplied).

From this description it would seem that the Interior Department at least was already viewing the Southern Ute territory as a permanent reservation not ceded under the terms of the 1880 cession. Specifically, the letter states that the survey line commence *at*, not *in*, the southwest corner of the ceded Ute land. Adhering to defendant's contention that *all* the lands were ceded in 1880, a literal interpretation of this letter would lead to an anomalous result. If the starting point was placed *at* the southwestern corner of Ute ceded land, the point would coincide with the converging point of the New Mexico, Colorado and Utah borders. The line could not extend to the western boundary of Colorado because it would start there.

It is also interesting to note how the Southern Utes themselves regarded their status during this time. In February of 1886, Ignacio, the principal chief of the Southern Utes visited Washington, D. C., along with several other of his subordinate chiefs and headmen, and appeared before the Senate Committee on Indian Affairs. The following is a colloquy between the committee and Buckskin Charley who although a subordinate to Ignacio, seemed to perform as spokesman for the Southern Utes (Sen.Rep.No.836, 49th Cong., 1st Sess. 1–2 (1886)):

Question. Why do you come here for?

Answer. We come here to see if we cannot exchange our reservation for another.

Q. Where do you want the new reservation located?

A. We want to go west of the present reservation.

Q. Why is it better to go that way?

A. The present reservation is narrow and long and we want to go west *and see if we can't sell it.*

Q. Do you come to Washington with the idea that the Indian Bureau can do what you want?

A. We come expecting to get legislation.

Q. You hold title under statute?

A. *Yes. Id.* (Emphasis supplied).

Thus the Southern Utes were still in possession of their part of their old reservation under claim of right. The Southern Utes wanted to quit their reservation for a number of reasons. These were pastoral people not interested in farming—the livelihood which the Government then wanted them to adopt. Even if they were willing to farm, their reservation encompassed an insufficient amount of arable land. They complained also that the winters were too harsh and the location too isolated from their traditional Indian neighbors. Their principal lament, however, was the increasing encroachments by neighboring white settlers. Consequent to the Brunot Cession of 1873 and the Act of 1882 opening up the bulk of the Utes' Colorado reservation, there was an influx of white settlers to the north of the Southern Ute reservation. To the south lay northern New Mexico, which was also being settled at that time. Thus the Indians were wedged between two white communities whose routes of trade and commerce followed the several rivers traversing the reservation. The Government was in a quandary. In a report to Secretary of the Interior dated April 5, 1888, J. D. C. Atkins, Commissioner of Indian Affairs acknowledged the following (Sen.Rep.No. 836, *supra,* at p. 3):

\*    \*    \*    \*    \*    \*

It would be next to impossible to close up the thoroughfares across the reservation. To do that would be to erect a "Chinese wall" 110 miles long, virtually cutting off all trade and intercourse between the large and increasing communities on either side of the reservation; and yet as a matter of fact, we are bound by solemn treaty stipulations [Sec. 2 of Act of 1882?] with these Indians to prevent white people from entering upon or crossing said reservation.

Two bills were subsequently introduced in the Senate—S.769 and S.1916—to effectuate the removal of the Southern Utes from their reservation. These bills were never enacted into law and it was not until 1888 that the Congress took positive steps to ameliorate the Indians' plight. Section 4 of the Act of 1888 (25 Stat. 133, 1 Kappler 266) reads as follows:

The Secretary of the Interior is hereby authorized to appoint a commission \* \* \* with authority to negotiate with the band of [Southern] Ute Indians \* \* \* for such modification of their treaty [1880?] and other rights, and such exchange of their reservation, as may be deemed desirable by said Indians and the Secretary of the Interior; and said commission is also authorized, if the result of such negotiations shall make it necessary, to negotiate with any other tribes of Indians for such portion of their reservation as may be necessary for said band of [Southern] Ute Indians \* \* \* if said Indians shall determine to remove from their present location; the report of said commission to be made to and subject to ratification by Congress before taking effect; \* \* \*.

Plaintiffs assert that this act confirmed the "separation of the Southern Utes, as an entity, from the Confederated Bands \* \* \*." That the Government negotiated exclusively with the Southern Utes for the "exchange of their reservation", is construed by plaintiffs "as a further Congressional recognition that the 15 mile strip [Royce Area 617] was the sole and absolute property of the Southern Utes and that they alone had the right to dispose of it." Perhaps believing it to be damaging to its case, defendant omits all reference to this act in its brief. Although the language

of this act tends to favor plaintiffs' position it is by no means conclusive. It merely authorized the establishment of a commission to engage the Southern Utes in negotiations for the purpose of persuading them to do belatedly what the Uncompahgre and White River Utes had done some years earlier, namely, to vacate their reservation and move elsewhere. A reasonable explanation for the act's exclusive terms is that the Southern Utes were the only band of the confederation as to whom the 1880 agreement was still executory. The agreement which emerged pursuant to this act substantiates this view. The Southern Utes agreed, *for no additional consideration,* to give up their reservation and remove *and settle upon a reservation in San Juan County, Utah.* Presumably, their evacuated reservation lands would then be sold in accordance with the Act of 1880 and the proceeds would be held for the collective benefit of the Confederated Bands in the prescribed proportions, that is, the consideration visualized in the 1880 agreement as accruing to the Southern Utes would still accrue.

Although routinely introduced, this agreement failed to receive Congressional approval; for six years it remained in limbo much to the dismay of the Southern Utes who continued to occupy their besieged reservation. In 1894 it was again introduced. Conceding the "anomalous position [of the Southern Utes] of having ceded their reservation and yet remaining on it", the Senate Committee on Indian Affairs favored ratification (Sen.Rep.No.279, 53d Cong., 2d Sess. 2–3 (1894)). Its House counterpart, although concurring in the view that the Southern Utes presented an anomalous situation, did not assent to ratification (H.R.Rep.No.799, 53d Cong., 2d Sess. 2–3 (1894)). It believed that the proposed reservation was too large for the Southern Utes and hence would encourage their nomadic ways. Therefore, instead, the House Committee recommended enactment of a pending bill which was eventually passed as the Act of February 20, 1895 (28

Stat. 677). The stated purpose of this Act was to annul the agreement of 1888 and enforce the treaty of 1880 which sought to settle the Indians in severalty. Since this, too, is a very important Act, the pertinent language will be quoted verbatim:

\*　　\*　　\*　　\*　　\*　　\*

Sec. 2. That within six months after the passage of this Act the Secretary of the Interior shall cause allotment of land, in severalty, to be made to such of the Southern Ute Indians in Colorado as may elect and be considered by him qualified to take the same out of the agricultural lands embraced in their present reservation in Colorado, such allotments to be made in accordance with the provisions of the Act of [1880] \* \* \* and the amendments thereto, as far as applicable hereto, and the treaties heretofore made with said Indians: *Provided,* That Indians taking allotments as herein provided shall retain their interest in all tribal property.

Sec. 3. That for the sole and exclusive use and occupancy of such of said Indians as may not elect or be deemed qualified to take allotments of land in severalty, as provided in the preceding section, there shall be \* \* \* set apart and reserved all that portion of their present reservation lying west of the range line between ranges thirteen and fourteen west of the New Mexico principal meridian, and also all of townships thirty-one and thirty-two of ranges fourteen (fifteen, and sixteen west of the New Mexico principal meridian and lying in the Territory of New Mexico, subject, however, to [certain government rights] \* \* \*; and the Government shall maintain an agency at some suitable place on said lands so reserved.

Sec. 4. That at the expiration of six months from the passage of this Act the President \* \* \* shall issue his proclamation declaring the lands embraced within the present reservation of said Indians except

such portions as may have been allotted or reserved under the provisions of the preceding sections of this Act, open to occupancy and settlement, and thereupon said lands shall be and become a part of the public domain of the United States, and shall be subject to entry under the desert, homestead, and town-site laws * * *; but no homestead settler shall receive a title to any portion of such lands at less than [$1.25] per acre, and shall be required to make a cash payment of 50 cents per acre at the time filing is made upon any of said lands: [certain provisos follow] * * *.

Sec. 5. That out of the moneys first realized from the sale of said lands so opened up to public settlement there shall be paid to said Indians the sum of fifty thousand dollars, as follows: Five thousand dollars annually for ten years * * * to be divided equally among all of said Indians per capita, irrespective of age or sex; also the sum of twenty thousand dollars of said proceeds shall be paid to the Secretary of the Interior, who shall invest the same in sheep and divide the said sheep among the said Indians per capita equally, irrespective of age or sex; [certain allotments also made to specific chiefs and headmen] * *; *that the balance of the money realized from the sale of lands, after deducting expenses of sale and survey, shall be held in the Treasury of the United States in trust for the sole use and benefit of said Southern Ute Indians. That nothing herein provided shall in any manner be construed to change or interfere with the rights of said Indians under any other existing treaty regarding any annuities or trust funds or the interest thereon.*

Sec. 6. That the foregoing provisions of this Act shall take effect only upon the acceptance thereof and consent thereto by a majority of all the male adult Indians now located or residing upon the reservation, which acceptance shall be at once obtained under such regulations as the Secretary of the Interior may prescribe. (Emphasis supplied.)

The Southern Utes could have allotments in severalty in Area 617, those who did not take these would move to a reservation in the western sector of Area 617; unallotted eastern sector lands would be sold not donated to homesteaders, for the Southern Utes' benefit. Unlike the Act of 1888, the Act of 1895 employs language ostensibly consistent with the Act of 1880 but it effects a conflicting result with the latter. We said earlier that by the plain terms of the Act of 1880, the Confederated Bands including the Southern Utes agreed to cede their entire Colorado reservation (Royce Areas 616 and 617) for consideration. Under the Act of 1895, however, the Southern Utes separately ceded all over again a part of their reservation (Royce Area 617) in exchange for an *exclusive* and *additional* consideration! Section 5 not only states that the balance of land sales proceeds, deducting certain Government expenses shall be held in the U. S. Treasury for the sole use and benefit of the Southern Utes, but also that no offsetting reductions should be made in their rights under prior treaties because of this consideration. The meaning to be ascribed this section is a focal point of controversy between the parties.

The Commission found, subscribing to plaintiff's position, that the United States after the Act of 1880 pursued a patterned course of conduct which at all times regarded the Southern Utes as the rightful owners of Royce Area 617. This conduct culminated in the agreement of 1895 which the Commission viewed as an "ultimate act" recognizing plaintiffs' ownership rights. Defendant contests this appraisal by offering one of its own. It contends that the additional consideration was actually "special benefits" gratuitously given the Southern Utes to induce them to take lands in severalty. The benefits, defendant admits, were proffered "at the expense of the United States and other Ute Bands."

Although it is debatable, we believe the evidence weighs substantially in favor of the Commission's interpretation. We are not persuaded that defendant's post 1880 conduct followed any clear direction. It was ambivalent, with some actions favorable to plaintiffs' case and others not. During all this time, however, the fact remains that the Southern Utes were allowed to remain on their surveyed reservation for 15 years after the purported cession, and the right to remove them without their further consent was not asserted or exercised. Here we have an interpretation given to the 1880 treaty by both parties thereto. Congress recognized this anomalous situation and deemed it necessary to tender new consideration for the land. Defendant's "special benefits" theory is supported neither by the express language of the Act nor by the legislative history surrounding its passage. Although earlier reports described the Uncompahgre and White River Ute removals as somewhat hostile, due to their unwillingness to leave, Congress did not think it necessary then to encourage their exodus with monetary inducements. On the contrary, it was reported by the Commissioner administering the White River Utes that military force was contemplated in accomplishing their withdrawal. (H.R. Doc. Ser. No. 2018, *supra*). Given the relations which existed between the United States Government and American Indians during this period it is difficult now to view the former as acting *ex gratia* wholly. The Southern Utes at that time, numbered slightly over 1,000. Certainly, if the United States wanted to make a gift it could have done so and still fallen far short of the promises embodied in section 5.

■ The more tenable theory, in our estimation, is that Congress recognized that by its protracted acquiescence in the Southern Ute occupation, Government rights to the land had somehow lapsed, or the agreement not being executed for so long a time, was rescinded and dead. It may be that the obligation to deal justly and honorably with the Indian wards did not allow insistence on full implementation of the apparent terms of the 1880 agreement. On the other hand, the Southern Utes obviously did not see themselves as mere squatters. The Congress therefore decided that if the land was going to be acquired free and clear new consideration was necessary. Hence we find section 5 of the 1895 agreement to be an explicit waiver of the Government's rights created in the 1880 agreement, whatever they were. It follows then that the Southern Ute lands in controversy were ceded in 1895 not 1880.

■ This position is bolstered by the Restoration of 1938 (5 Kappler 659), which the Commission found as defendant's second ultimate act in recognizing plaintiffs' ownership rights. In an order by the Secretary of the Interior issued pursuant to sections 3 and 7 of the Indian Reorganization Act of June 18, 1934 (48 Stat. 984) the Southern Utes were restored to their tribal ownership of all lands not disposed of under the Act of 1895. The first paragraph of this order reads as follows:

> * * * [P]ursuant to the provisions of the Act of February 20, 1895 * * * the Southern Ute Band of Indians in Colorado *ceded* to the United States a large area of their reservation in the State of Colorado established *expressly for their benefit under the treaty of June 15, 1880* * * *. (Emphasis supplied).

Thus, defendant's officials do not only concede that the lands were ceded in 1895, but they also enlighten us as to the status it retrospectively applied to the 1880 agreement. Such a statement by an executive agency bearing on the meaning of a treaty must be accorded great weight. Creek Nation East of the Mississippi v. United States, 165 Ct.Cl. 479, 486, cert. denied, 379 U.S. 846, 85 S.Ct. 37, 13 L.Ed.2d 50, reh. denied, 379 U.S. 918, 85 S.Ct. 258, 13 L.Ed.2d 189 (1964).

I.

A. Defendant's principal contention that the Southern Utes' claims have been

finally settled by prior adjudication evaporates in the presence of our conclusion. The cases upon which it relies, namely the 1910 accounting case No. 30360 (45 Ct.Cl. 440 (1910)) and the 1950 settlement case No. 46640 (117 Ct.Cl. 433, 436 (1950)), were both intended to settle claims arising out of the 1880 cession exclusively. The Jurisdictional Act of 1909 (35 Stat. 788) which enabled this court to hear the accounting claim of the Confederated Bands was expressly limited to claims arising out of the Act of 1880. Hence any claims exceeding the limits of this mandate which were adjudicated in the 1910 accounting were improvidently heard. Not so limited was the Jurisdictional Act of 1938 (52 Stat. 1209) which authorized the 1950 settlement cases. On the contrary, this act conferred jurisdiction upon us to adjudicate *all* legal and equitable claims which the Ute Indians or any individual tribe or band thereof may have against the United States as to claims arising under *any* treaty of the United States. The stipulation—the bulwark of defendant's case—upon which we entered judgment in case No. 46640, however, was qualified as follows:

> * * * [T]he judgment to be entered in this case is *res judicata* * * as to any land formerly owned or claimed by the plaintiffs [Confederated Band of Utes] in western Colorado, *ceded to defendant by the Act of June 15, 1880* * * *. (Emphasis supplied.)

The stipulation recited numerous parcels in 616 and none in 617, though an effort was made for the list to be comprehensive. Since the Commission originally found that the agreement of 1880 only ceded land in Royce Area 616, it concluded summarily that this stipulation did not extinguish the instant claims.

We remanded this case to get a better idea of exactly what the parties meant to stipulate in 1950, namely, what they *then* thought was ceded by the Act of 1880. As reflected in the Commission's supplemental findings, plaintiffs' witness, a signatory to the stipulation and the then attorney of record for the Confederated Bands, gave testimony entirely consistent with the Commission's original findings. Defendant, however, insisting that the stipulation was self-explanatory and that the intent of the parties would have to be discerned from the written instrument declined to put on witnesses. Of the Government signatories, only one is still living—Marvin J. Sonosky, Esquire, who is a member of our bar and is now in private practice. Having no independent recollection of the precise extent of the stipulation, Mr. Sonosky was unable to give useful testimony. He did indicate, however, in an affidavit submitted to the Commission, that as the attorney in charge of the 1950 Ute litigation he prepared a memorandum recommending settlement. Defendant withheld from the Commission this memorandum and related papers declaring them to be the work products of the attorneys of the Department of Justice and therefore privileged under Order of the Attorney General No. 381–67 (July 4, 1967).

We have recently considered in Weiss v. United States, 180 Ct.Cl. 863 (1967), the question of privilege for papers and opinions prepared by attorneys in the executive branch. The topic is comparatively new and the case law still scanty. We do not believe the privilege should extend beyond the reasons for its existence, which are the freedom of the officials to receive staff advice in confidence, and the reluctance of courts to allow counsel in any lawsuit to raid and use the work product of his adversaries. Mr. Sonosky apparently needed to refresh his memory only, and introduction of his report in evidence was unnecessary. He was not in the employ of plaintiffs. The officials to whom Mr. Sonosky submitted his report, and who approved it, being dead, could not now be embarrassed. The report was not prepared for use in trial of the current or any then pending litigation, but was apparently to explain and justify a settlement. It certainly seems more than questionable whether execu-

tive privilege does or should apply to consultation by a witness of a document he himself has prepared, for the purpose of refreshing his memory. If defendant is right, by consistency it should have a privilege to muzzle Mr. Sonosky in case his memory should be adequate without refreshment, yet no such right is claimed or can be imagined. Defendant in this instance has clearly not done all it might have done to clear up any uncertainty there may be about the intent of the parties to the stipulation. We think we are justified in inferring that neither party intended the stipulation to apply to Area 617. The most that can be said is that, by referring to territory ceded in 1880, the stipulation might have been intended to refer to the unexecuted, negated cession of Area 617, or it might not. If we must, as defendant urges, confine our view to the stipulation itself and other papers in that case, we find insufficient reason there to hold it applies to areas not *effectively* ceded. If we have a right to inquire directly into the understanding of the parties at the time, to resolve an ambiguity, defendant's handling of the Sonosky memorandum is pregnant with the admission that Mr. Sonosky, his memory refreshed, would not testify favorably to defendant. Since plaintiffs' testimony was unequivocal and no reason is suggested for disbelieving it, we conclude that the parties never intended the stipulation to apply to Area 617, and therefore it did not so apply.

B. Defendant's second defense is that plaintiffs, the Southern Utes who now only consist of the Moache and Capote bands, are not the exclusive owners of these claims. Specifically it contends that either the Uncompahgre and White River Utes have a joint interest in these claims, or alternatively that the Weeminuches, now known as the Ute Mountain Utes, are co-owners with plaintiffs. Because of this alleged failure to join interested parties, defendant, without citing precedent or other authority, urges reversal.

Responding to the first assertion, we find that the Uncompaghre and White River Utes have no interest in the instant claims. The 1895 agreement was made between the United States and the Southern Utes and only the latter were to have any share in proceeds. However apparently inequitable it may have been to grant the Southern Utes joint interest with the Uncompahgre and White River Utes in the Area 616 proceeds and then give them exclusive interest in Area 617 proceeds, this was the stated intent of Congress not to be disturbed presently by this court. Any claim these tribes might raise against the Government to redress this matter would emanate from a right other than that of beneficiaries under the Act of 1895.

Defendant's second contention raises a more perplexing question. Plaintiffs insist that the Weeminuches, by accepting the western reservation offered in the 1895 agreement, relinquished all claim to any land in the eastern sector. By accepting allotment in the east, the Moache, and Capote similarly relinquished claims to western lands. Hence, plaintiffs assert that since the instant claims all arise out of eastern land dispositions, they, by this mutual exchange, own the exclusive rights. The Commission, without referring directly to this cross-relinquishment theory, concurred in plaintiffs' conclusion, 17 Ind.Cl.Comm. at p. 52, saying:

\* \* \* [A]ny claim which the Ute Mountain Utes might have \* \* \* would be *separate* from the claim of petitioner. Petitioner herein claims no land in the present-day Ute Mountain Reservation. (Emphasis supplied).

█ Fortunately, we can decide this issue without reaching the merits. Although the Commission's rules of practice and procedure were then and still are silent as to joinder questions, we hold that joinder of parties before the Commission is required only if the joint interest is existing. Assuming *arguendo* that the Ute Mountain Utes once owned an interest in this claim, we believe that they forfeited it by failing to timely file

a claim before the Commission. Not only is this holding literally consistent with our own Rule 62(a) which dictates joinder of any persons *"having* a joint interest adverse to the United States" (Emphasis supplied) but, it also does no violence to the salient concepts which underlie the joinder of "indispensable" parties rule. By rendering a judgment for plaintiffs, we do not prejudice the claim of the absent Ute Mountain Utes since their claim is no longer extant. Accordingly, consequent to such judgment, defendant will not suffer any inconvenience or harassment of further litigating this issue. We therefore hold that the Southern Utes, consisting of the Moache and Capote bands, are *presently* the sole and exclusive owners of the instant claims. Hence they are eligible to pursue their remedy without additional parties.

C. Defendant conceded at oral argument that should we find that plaintiffs' claims were not extinguished by the 1950 settlement, and should we find plaintiffs the sole owners of their claims, then it is liable for gratuitously giving away plaintiffs' land. Questions of quantum, however, are still raised by defendant. First, it contends that the Commission's finding that defendant is liable to compensate for 230,547.44 acres is not supported by substantial evidence. Second, in order to avoid payment of interest, it says it is liable, if at all, for breach of contract, rather than to pay just compensation for a 5th amendment taking.

Deferring the acreage issue for the Commission, we now explore the nature of defendant's liability. Plaintiffs argue that under the 1895 Act their ancestors ceded whatever interest they had in their lands in trust to defendant in exchange for a beneficial interest in the proceeds. Sustained by the Commission below, plaintiffs assert that the free disposal of their lands with no substitute consideration offered by defendant was a taking under the 5th amendment entitling them to the just compensation. Plaintiffs, in support of their position, cite several cases, but the one we find to be

most in point is Confederated Bands of Ute Indians v. United States, 100 Ct.Cl. 413, 430 (1943).

■ Attached to the Jurisdictional Act of 1938, *supra*, was the so-called Adams Amendment which declared certain Ute land ceded under the Act of 1880 but not disposed of "to be the absolute property of the United States". In *Confederated Bands, supra*, we started with the proposition that "[t]he interests and obligations created by the agreement of 1880 do not fit readily into conventional legal concepts, such as trusts, agencies, debts or *contractual* obligations, and mortgages or security interests." (p. 425) (Emphasis supplied). We went on to comment that "[t]he problem [was] further complicated by the fact that one of the parties * * * was a sovereign which could and did, regardless of the terms of the agreement, do what it pleased with the lands and their proceeds, giving the Indians the privilege of having their legal rights determined only at long intervals * * * when the sovereign deigned to waive its immunity from suit." (p. 425). In short, this was not the typical arms'-length contract relationship. Declining to consider whether the Government assumed the duty of trustee, we found that the Indians under the agreement of 1880 retained an interest in the land—the right to the proceeds from sales—and that this interest was destroyed by the enactment of the Adams Amendment. Given these circumstances we held the destruction of this right to be a taking under the 5th amendment. Presently we are confronted with a like set of circumstances. The agreement of 1895—patterned after the 1880 agreement—embodies rights and interests which similarly evade accurate legal classification. Again, as in *Confederated Bands*, we have a situation where the Government cavalierly exercised its sovereign power without giving thought to providing consoling justification, let alone immediate chance for redress. By the Free Homestead Act of 1900 (31 Stat. 179) defendant promised that "all sums of money so released [herein] which if

not released would belong to any Indian tribe shall be paid to such Indian tribe by the United States * * *." By failing to make good this legislative promise of substitute consideration, defendant, in effect, dealt with plaintiff's land as its absolute property. Guided by our reasoning in *Confederated Bands,* we hold that plaintiffs, under the agreement of 1895, retained an interest in the ceded lands, namely, the right to receive sales proceeds or the equivalent thereof. As in *Confederated Bands,* this interest was destroyed by defendant's exercise of sovereign power. We hold therefore that the free disposal of the lands was a taking of plaintiffs' property right under the 5th amendment entitling them to just compensation.

This holding is not in conflict with Confederated Salish & Kootenai Tribes, etc. v. United States, 175 Ct.Cl. 451, cert. denied, 385 U.S. 921, 87 S.Ct. 228, 17 L. Ed.2d 145 (1966). The pertinent facts of that case are as follows: The Government in 1904 enacted legislation which authorized using plaintiff Indians' monies, held in trust, to defray the expenses of surveying their land. Since we had earlier found that by a prior treaty the Government had obligated itself to assume the cost of surveying, 167 Ct.Cl. 405 (1964), the issue subsequently presented was whether its use of Indian trust funds in violation of the treaty was a taking under the 5th amendment. We rejected this claim for two reasons: First, we noticed that since "legal title to the funds on deposit in the Treasury lay in the United States * * * [the] Indians' interest was, at most, that of a beneficiary, and a trustee's failure to live up to the standards imposed upon him is not a taking of title from the cestui but a breach of obligation.", 175 Ct.Cl. at p. 455. Our second reason, however, raised an even "deeper objection": "Money in the Federal treasury, even on deposit, cannot be simply equated with private property. Where such funds are involved it requires extraordinary circumstances, not present here, to find an

eminent domain taking in a withholding or use of money by the Federal Government.", at pp. 455–456. We then proceeded to discuss the anomalous consequences plaintiffs' theory would engender with regard to "claimants who could show some sort of title to funds in the Treasury" and those who could not. We noted further that "[m]ere form sometimes has meaning, but usually not where, as here, the choice of forms seems haphazard and accidental. Considerations like these have impelled courts to shy away, generally, from designating the withholding or diverting by the defendant of funds in the treasury as an eminent domain taking.", at p. 456. Defendant argues here that its exempting of homesteaders from making cash payments and its failure to reimburse plaintiffs for loss of proceeds at most were breaches of contract or breaches of trust which, even if deplorable, do not constitute a 5th amendment taking. Defendant's breach of contract argument doubtless springs from our reasoning in *Confederated Salish,* wherein we noted, even though not argued by plaintiffs, that defendant's use of Indian monies for a project which it had earlier promised to finance itself was a breach of agreement, that plaintiffs' violated rights were contractual rights, and that the "taking away of *contractual rights,* via a rupture of the contract, is of course not equivalent to a taking of *property* under the Fifth Amendment.", at p. 455. (Emphasis in original). This is applicable to a mere breach of a contract but perhaps not to its overt repudiation. Lynch v. United States, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934). But, as we have held, we need not find that latter situation here since whatever the exact legal nature of the parties' interests and obligations under the 1895 agreement, they are more than contractual. Thus defendant's breach of trust argument must also fail. Admittedly, under the agreement of 1895, defendant promised to hold *monies* in trust for plaintiffs; hence, as to this *res* it might

well have been called a trustee. Still unclear and unresolved, however, is defendant's status as to the *lands* in question. In our earlier interpretations of the Act of 1880, whose land disposal provisions are sufficiently interchangeable with those of the act at bar, we never described defendant as being an actual trustee as to the lands. Specifically, we said that it was unnecessary to classify the Government as a trustee as to the 1880 lands in question, 100 Ct.Cl. at p. 432, and that it occupied a position "comparable to a trust", 112 Ct.Cl. at p. 130. If defendant is correct in reading *Confederated Salish* as standing for the proposition that breaches of trust are ineligible *per se* for treatment as 5th amendment takings, then we reply that defendant was *not* or not solely a trustee as to the lands in question. To say otherwise would necessitate overturning our previous decision that the enactment of the Adams Amendment was a taking. It is obvious, however, from Navajo Tribe of Indians v. United States, 364 F.2d 320, 176 Ct.Cl. 502 (1966) that the United States is not exonerated from paying interest, as for an eminent domain taking, merely because the obligations of the United States with respect to the Indian lands involved in the claim were denominated as being, among other things, those of a trustee.

Since each taking occurred when the ownership of a homesteader became final, Creek Nation v. United States, 302 U.S. 620–622, 58 S.Ct. 384, 82 L.Ed. 482 (1938), we leave it to the parties to decide whether to assume the burdensome task of fixing the date of patent for each homesteader and compute the damages individually, or rather, as suggested by the Commission, to fix an average date or dates for the takings and compute the damages generally.

## II.

Plaintiffs' second claim in this case is for an accounting of funds collected by the defendant in the course of selling plaintiffs' land under the 1895 agreement. In their petition filed with the Commission on August 10, 1951, plaintiffs timely alleged a claim for an accounting for moneys received by defendant for some 81,953.18 acres of land disposed of in various ways other than as free homesteads. Responding to this claim, defendant submitted a General Accounting Office (GAO) report accounting for proceeds derived from sale of certain lands pursuant to the Act of 1895, together with an accounting of the interest on said proceeds during the period from February 12, 1929 to June 30, 1951. Plaintiffs, after studying this report, filed exceptions to its contents. These exceptions were filed on June 12, 1963. Amended exceptions were subsequently filed on September 30, 1963. The Commission, in its interlocutory order, declared that defendant should make a further and complete accounting in line with specified rulings on each of plaintiffs' exceptions.

Defendant contests this decision on procedural grounds but makes no objection to the substance of any of the Commission's rulings on plaintiffs' exceptions. The procedural defenses are these: First, the accounting claim alleged in plaintiffs' originally filed petition was already rendered by prior adjudication. Second, the subsequent accounting claims amended in 1963 by way of exceptions were untimely filed additional claims. Hence the Commission under 25 U.S.C. § 70k (1964) had no jurisdiction to rule on these claims. Third, the Commission's order for an up-to-date accounting was beyond its jurisdiction under 25 U.S.C. § 70a (1964).

Regarding the first defense, we can dispose of it summarily. Since we have held that the 1950 settlement case No. 46640 was limited to settling accounts for the 1880 cession exclusively, we are compelled to find that plaintiffs' original accounting claim which derives from the agreement of 1895, was not included and is therefore still cognizable.

The second defense, however, does not admit to such easy disposition. Plaintiffs, perhaps content to rest on the Commission's reasoning, made no response to

it in their brief. The Commission excused plaintiffs' late pleadings even though it recognized that the exceptions raised general accounting claims not referred to in plaintiffs' original petition. Despite the difficulties stemming from the language of its enabling legislation— 25 U.S.C. § 70k—it reasoned that since plaintiffs could not have discovered any of their trustee's indiscretions until receiving the GAO report, this matter should be treated under the general legal principle that "limitations [do not] * * *。 begin to run until the aggrieved party knew, or should have known, that his trustee had created a cause of action through the handling of the trust moneys.", 17 Ind.Cl.Comm. at p. 54. This result was deemed particularly equitable in the light of defendant's "unique position" of not having to render periodic accounting to its "Indian wards". "It [the Government] should not," said the Commission, "be allowed to take advantage of that fact for its own protection". *Id.*

Although we agree with the Commission's resolution of this issue, we do not feel compelled to comment on its novel rationale. Rather it is our belief that plaintiffs' exceptions were merely amendments to their timely filed petition. United States v. Northern Paiute Nation, 393 F.2d 786, 790, 183 Ct.Cl. 321, 328 (1968); The Snoqualmie Tribe of Indians, etc. v. United States, 372 F.2d 951, 959, 178 Ct.Cl. 570, 585 (1967), and as such under the Commission's rule of procedure 13(c) they relate back to the time of original filing, thus curing the jurisdictional time bar defect. That the Commission itself did not similarly construe these exceptions is understandable, since its 1966 decision in this case was rendered without the guidance of the above mentioned cases. In *Snoqualmie* we allowed the late amendment because by the Snoqualmie's original petition the Government "was put on notice in 1951 of the *possibility* that the Snoqualmie organization *might* expand the scope of its claim.", *Snoqualmie*, 372 F. 2d at p. 961, 178 Ct.Cl. at p. 589. (Em-

phasis supplied.) The same is true of the instant case. Admittedly plaintiffs' original petition requested an accounting for certain specified items. Responding to this petition, defendant submitted the GAO report but not without expressly restricting its introduction to the issues of liability raised in the petition. This precautionary measure, which the Commission found correctly to be specious, indicated, in our opinion, that defendant knew from the outset that to adequately respond to plaintiffs' petition it would have to submit the GAO report which contained various ignoble confessions. That it declined to contest before the Commission the substance of plaintiffs' exceptions underscores its concession to the obviousness of its fiduciary misconduct disclosed in the report. We therefore find that the substance of plaintiffs' original petition put defendant on notice that it might have to defend against a broader claim. This finding was stated implicitly by the Commission, 17 Ind.Cl.Comm. at p. 55:

We are of the opinion that the allegation for a specific accounting which brought forth the [GAO] accounting report and thereby revealed other and further apparent misuse of petitioner's funds, is a *sufficient basis* for requiring a further and complete accounting from defendant with regard to those items questioned by petitioner in its exceptions. (Emphasis supplied.)

Thus, following *Snoqualmie* and *Northern Paiute,* we hold that plaintiffs' exceptions relate back to the date of the original petition.

Defendant's third procedural contention is that the Commission's order for an up-to-date accounting report is beyond its jurisdiction. 25 U.S.C. § 70a (1964) on its face bars the Commission from considering any claims accruing after August 13, 1946. In a previous interpretation of this section, however, we have said that where the Government's initial wrongdoing giving rise to a claim accruing before August 13, 1946, but continued past this time, the Indian Claims Commission was free to

determine the extent of its jurisdiction in framing an award. Gila River Pima-Maricopa Indians, et al. v. United States, 140 F.Supp. 776, 779, 135 Ct.Cl. 180, 186 (1956), 157 Ct.Cl. 941 (1952). We expressed agreement in that case with the established principle that "a court once having obtained jurisdiction of the persons and subject matter of a suit, retains such jurisdiction for all purposes including the awarding of all damages accruing up to the date of judgment." We hereby reaffirm our adherence to this principle and hold the Commission correctly ordered an up-to-date accounting for continuing Government wrongdoings which predated and postdated the statutory time bar.

In view of the foregoing, we affirm as to the taking claim and all of the Commission's determinations related thereto, except for the finding that defendant is liable for just compensation for taking exactly 230,547.44 acres of land, the Commission having offered no explanation as to how it reached this figure. In remanding to the Commission the task of approving the amount of compensation due, we therefore do not restrict plaintiffs' recovery or fix defendant's liability at the 230,547.44 figure. We also affirm the Commission's decision as to the accounting claim. Accordingly, we return the case to it with the task of conducting the accounting consistent with rulings which were the subject of this appeal.

Affirmed and remanded.

SKELTON, Judge (dissenting):

I respectfully dissent. I cannot agree with the reasoning of the majority nor with the result they reach. In my opinion, the Indians in this case, along with other Southern Ute tribes, were paid $31,938,473.43 in 1950 for the identical land involved here, together with other lands. This was the largest judgment ever awarded by this court since it was established in 1855. The attorneys who represented the Indians in the recovery of this tremendous judgment received an attorney fee of $2,800,000. See Confederated Bands of Ute Indians v. United States, 120 Ct.Cl. 609 (1951). As will be seen in the following pages, the same Indians and the same attorneys are before the court again in this case asking that they be paid again (twice) for the same land, and the opinion of the majority is going to allow them to get this double payment. This results, in my opinion, in a shocking giveaway of millions of dollars of public money of the United States, and I cannot agree to it.

The overriding error in the opinion of the majority is the failure to honor the doctrine of *res judicata*. The crucial issue is whether the lands now at bar were included in the judgment of this court in Confederated Bands of Ute Indians v. United States (Nos. 45585, 46640, 47564, 47566) 117 Ct.Cl. 433 (1950), in which, as stated above, the plaintiff and other Ute Indians were awarded over 31 million dollars in settlement of all of their claims, including those involving the lands in this case.

The judgment in No. 46640 (of over six million dollars) was entered pursuant to a stipulation signed by the attorneys for both parties to the law suit including the attorneys for the plaintiff in the present suit. Using language as clear and unambiguous as is possible in the English language, the plaintiff Confederated Bands (which included the present Southern Ute Band, appellee in the suit before us) entered into a complete release, extinguishment and settlement of any and all of their claims regarding the land then at bar. The parties agreed that:

* * * [J]udgment * * * shall be entered in this cause as *full settlement and payment* for the *complete extinguishment* of plaintiffs' right, title, interest, estate, claims and demands of whatsoever nature in and to the land and property in western Colorado ceded by plaintiffs to defendant by the Act of June 15, 1880 (21 Stat. 199), which (a) the United States sold for cash between July 1, 1910, and June 28, 1938, (b) disposed of as free homesteads from December 19, 1885, to June 28, 1938, and (c) set aside for public purposes during the period from

June 30, 1910, to June 27, 1938. The plaintiffs concede that due and proper accounting has been made by the defendant to the plaintiffs for those lands sold for cash during the period from June 30, 1910, to June 28, 1938. * * * [Emphasis supplied.] [*Id.* at 436–437.]

The stipulation then went on to describe a "Schedule 1," which contained the legal descriptions of approximately 1,523,236.-95 acres of land embraced by the stipulation, saying: "So far as the parties with diligence have been able to determine these descriptions represent all the land so disposed of and set aside." [*Id.* at 437.] This Schedule 1 contains 338 pages of single-spaced, typewritten legal descriptions of land. A land expert would find it difficult, if not impossible, to make sense of this Schedule 1. Even if he were to analyze it, months of his time would be required in the process. When confronted with the schedule of lands pursuant to settling case No. 46640, the government only ran a spot check of the schedule, and concluded that while there were errors, it was impractical to continue the examination. Evidencing an obvious lack of reliance on the correctness and completeness of Schedule 1, the stipulation signed by both parties went on to state:

> * * * However, the judgment to be entered in this case is *res judicata, not only* as to the land described in Schedule 1, *but, whether included therein or not, also* as to *any land* formerly owned or claimed by the plaintiffs in western Colorado, *ceded to defendant by the Act of June 15, 1880* (21 Stat. 199), and by the defendant during the aforesaid periods of time sold for cash, disposed of as free homesteads and set aside for public purposes. * * * [Emphasis supplied.] [*Id.* at 437.]

One searches in vain for a more clear, a more precise, a more final disposal and release of claims, than the one just quoted.

As stated earlier, the key issue now is whether the lands presently at bar, lands from Royce Area 617 in southwestern Colorado, were included in this all-inclusive 1950 settlement. To determine this, one must analyze the history of the lands at bar, to determine whether these lands are part of the "land and property in western Colorado ceded by plaintiffs to defendant by the Act of June 15, 1880 * * *."

The majority has explained the history of this land prior to 1880. To avoid being repetitious, I will start my analysis at 1880. The agreement of 1880 which resulted in the Act of 1880 was inspired by the so-called Meeker Massacre of 1879, in which an Indian agent and others were killed by certain Utes. The government sought to pacify the nomadic Utes by domesticating them, to the extent that each Indian would be given an allotment of agricultural land, upon which he would be converted from a nomad to a farmer. The vast majority of the 1869 Ute Reservation was not suitable for agricultural purposes; therefore, other lands had to be found. So under the Act of 1880, the Uncompahgre Utes were to move to agricultural lands on the Grand River in Colorado and Utah, and there receive their allotments. The White River Utes were to move to agricultural lands on the Uintah Reservation in Utah, and there receive their allotments. There was some suitable agricultural land in southwestern Colorado along the LaPlata River, and it was to this area that the Southern Utes were to move and receive their allotments. Section 3 of the 1880 Act authorized the Secretary of the Interior to survey the lands in the vicinities mentioned, and then the Commissioners were to cause allotments to be made to each and every Indian. Then the Act states, in clear, precise, and totally unambiguous language:

> * * * [*A*]*nd all the lands not so allotted*, the title to which is, by the said agreement of the confederated bands of the Ute Indians, and this acceptance by the United States, *released and conveyed* to the United States, shall be held and deemed to be public lands of the United States and subject

to disposal under the laws providing for the disposal of the public lands, * * *. [Act of June 15, 1880 (21 Stat. 199).]

Clearly (it could not be stated more clearly), the surplus of the lands after allotments were made was conveyed to the government by the 1880 Act. Therefore, the words in the 1950 case No. 46640, "ceded by plaintiffs to defendant in 1880," words which are descriptive of the lands involved in the 1950 settlement, include the lands presently before the court, and the doctrine of *res judicata* bars any further recovery.

Another look at the purpose of the 1880 Act reaffirms this conclusion. No new reservations were created by this Act. Rather, each tribe was merely moved to a certain area of land, out of which the tribe members were to receive individual allotments. No Uncompahgre Reservation was set up in Colorado and Utah, no White River Reservation was established in Utah, and no Southern Ute Reservation was established in southern Colorado.

How do appellees, the Southern Utes, try to get around this clear language? This is a difficult question for them to answer, and several different theories have been pressed upon the court at various stages of these proceedings. In its brief, the appellees say that the converse of the plain terms of the 1880 Act is true, namely, that the land now at bar was set apart and ceded to the Indians by the 1880 Act. This is patently insupportable by the clear terms of the 1880 Act.

The second theory was advanced when this case was first up for oral argument in 1967, and counsel for appellees made a straightforward and honest acknowledgement in open court that the lands at bar were indeed ceded to the government in 1880, but were in effect receded to the Indians by the Act of 1895. In light of this acknowledgement, the court entered an order of remand for the taking of additional evidence as to the intention of the parties to the 1950 stipulation. Apparently realizing the devastating damage that this acknowledgement did to their case, and that they could not prevalid under it, appellees' counsel later said that the court "misconstrued" the acknowledgement, and sought to explain it away in its Motion to Vacate Order of Remand. The court did not misconstrue the statement. I was present and heard counsel make it. To clear the record, an examination of the 1895 Act to bring to light its true effect and purpose is in order. Unlike the Uncompahgre and White River Utes, who soon went to the land set aside for them and took allotments, the Southern Utes resisted allotments. Apparently, the life of the farmer did not appeal to them, so they continued living in a nomadic state within the bounds of the land set aside for their allotments. In 1888 they attempted to negotiate a settlement to move to Utah, but this was not ratified. So here the Southern Utes were, living within a land area, but refusing to take allotments as directed by the Act of 1880. To verify this, we have only to look at appellees' own evidence in this case. Exhibit No. 5 before the Indian Claims Commission contained a copy of a report dated April 28, 1894, from the Commissioner of Indian Affairs to the Congress. Speaking of the Southern Utes' presence on the land set aside for allotments by the Act of 1880, the Commissioner said, "Here they have remained ever since, being in the anomalous condition of having ceded their reservation and yet remaining upon it." The Commissioner in 1894 clearly understood the stalling tactics of the Southern Utes, and saw the necessity for bringing an end to this "anomalous condition." And indeed, it was to end this condition that the Act of 1895 was passed. This Act did not change the 1880 Act; the declared purpose of the 1895 Act was that " * * * [T]he *treaty made with said Indians June fifteenth, eighteen hundred and eighty, be carried out as herein provided, and as further provided by general law for settling Indians in severalty.*" [Act of February 20, 1895 (28 Stat. 677).]

[Emphasis supplied.] A reading of the Act of 1895 makes it manifestly apparent that no cession, no reservation was encompassed. Rather, the Indians who would take allotments were given them, and those who refused were moved to a reservation in New Mexico and western Colorado. (This is the present site of the Ute Mountain Reservation—this land is not in issue in the case now before the court.) The remainder of the land in Royce Area 617 after allotments were assigned (this is the land at bar) was opened for settlement under the homestead laws for the first time. (It should be noted that the sale of the land under the homestead laws was a violation of the Act of 1880. That is why, I believe, the 1950 settlement with the Indians included land " * * * disposed of as free homesteads from December 19, 1885, to June 28, 1938, * * *." [*Id.* at 437.]) So any argument that the land was receded to the Indians in 1895 cannot be sustained.

This leads directly to the third theory advanced by appellees regarding its retention or acquisition of the lands presently before the court. This theory, set forth in the Motion to Vacate Order of Remand and in the most current oral argument before the court, states in effect that the lands were "set-aside" in 1880, and officially recognized as Southern Ute lands in the Act of 1882. This argument, just as the prior arguments, misses the mark. The first half of this argument is true. The lands were indeed set-aside in 1880, but as we have shown, only for the purpose of taking allotments. The remainder after allotments was released and conveyed to the United States, and therefore clearly within the 1950 settlement with the Indians (Case No. 46640). The second part of the argument is a misinterpretation of the clear terms and purpose of the Act of July 28, 1882 (22 Stat. 178). By the time of this Act, the Uncompahgre and White River Utes had moved from the former Colorado Reservation to the areas set aside by the Act of 1880 for their allotments. Therefore, this vacated land area was now ready for settlement, and the Act of 1882 was passed to open this area for disposal under the terms of the Act of 1880. But the Southern Utes were still (and for thirteen more years continued) stalling, so the remainder after allotments of their set-aside land area was not ready for settlement. The government wished to keep this set-aside area intact for allotment purposes until allotments were made, so paragraph two was inserted in the Act of 1882, to provide for the surveying of a line between the lands opened, and the lands set aside for allotments. Keeping this area temporarily intact for allotments was the sole purpose and sole legal effect (before the majority opinion of this court in this case) of the Act of 1882. There is again a complete absence of any words of cession or reservation. Therefore, this theory advanced by appellees is without merit.

In fact, no theory has been advanced by the Southern Ute Indians which would enable us to uphold the opinion of the Indian Claims Commission. Rather, the government has successfully shown that the Commission's opinion must be reversed. The 1950 settlement (117 Ct.Cl. 433, 436) is applicable, because the lands at bar were included in that case. The appellees are absolutely bound and barred by the 1950 case; the doctrine of *res judicata* cuts them off. Any other conclusion would be a violation of the Supreme Court's holding in United States v. Wm. Cramp & Sons Ship & Engine Building Co., 206 U.S. 118, 128, 27 S.Ct. 676, 51 L.Ed. 983 (1907), where the Court said:

Stipulations of this kind are not to be shorn of their efficiency by any narrow, technical, and close construction. The general language "all and all manner of debts," etc. indicates an intent to make an ending of every matter arising under or by virtue of the contract. If parties intend to leave some things open and unsettled, their intent so to do should be made manifest. * * * [*Id.* at 128, 27 S.Ct. at 678–679.]

The language of the 1950 stipulation is even clearer, more all inclusive, and more final than that quoted by the Supreme Court. It says that the judgment entered in that case is *res judicata*, "not only as to the land described in Schedule 1, but, * * * also as to any land formerly owned or claimed by the plaintiffs in western Colorado, ceded to defendant by the Act of June 15, 1880 (21 Stat. 199), and * * * disposed of as free homesteads * * *." To tie up all the loose ends, this court in 1950 went even farther, and said " * * * The petition of plaintiffs herein shall be deemed amended to conform to this stipulation." [*Id.*, 117 Ct.Cl. at 437.] The comprehensive terms of the stipulation for judgment in case No. 46640 show an intent to clean up and close up every claim arising out of the government's dealings with the Ute Indians and their former Colorado Reservation land. There is no manifestation of an intent to reserve any claim. Appellees' present claim falls squarely within the four corners of the 1950 settlement, and has therefore already been settled, paid, and extinguished.

And, the tribe is further bound because of the concession it made in this 1950 stipulation. The stipulation, accepted by this court and the parties to the suit, read "The plaintiffs concede that due and proper accounting has been made by the defendant to the plaintiffs for those lands sold for cash during the period from June 30, 1910, to June 28, 1938." At the time this concession was made, the GAO Report for case No. 46640 had been mailed to the attorneys for the Southern Utes. This report (Def's Ex. No. 21) included sales from the Southern Ute portion of the 1880 cession under the Act of 1895. The Tribe conceded that this accounting was due and proper. (Sales from the Southern Ute portion of the 1880 Cession up to 1910 were accounted for in case No. 30360 (45 Ct.Cl. 440 (1910))).

The Indian Claims Commission dismissed this crucial factor, saying that the amounts included were merely errors on the part of all concerned. These "errors" amounted to $215,989.95 paid under section 3 of the Act of 1880, and $215,977.58 paid under section 5 of the Act of 1895. The true error here was made by the Commission in not recognizing the true nature of this former compromise and settlement of appellees' claims.

One additional point should be raised regarding the effect of case No. 46640. This court ordered the case remanded to the Indian Claims Commission in 1967 with instructions to hear additional evidence on the intention of the parties signing the stipulation. The only testimony taken at the rehearing was that of Dr. Ernest L. Wilkinson, signatory to the stipulation in case No. 46640, and of Georgette Betor Lee Hall, who took part in preparing Schedule 1. The government took the position that the stipulation spoke for itself, and that the parties' intentions should be determined from the four corners of the instrument. Further, the government produced no documents, contending that all such requested material was the work product of the attorneys for the Department of Justice, and, therefore, privileged information protected by order of the Attorney General. Not surprisingly, Dr. Wilkinson, attorney for the appellees, testified that it was not his intention to include any of the lands presently at bar in the 1950 stipulation. It is appropriate to point out that if he had said anything else, he would have made himself ridiculous in that any other statement would have contradicted appellees' brief and his own law firm's position in this case. No weight can be given to these additional findings of fact. And a case of this magnitude cannot be decided because of a disagreement by the court with the government's policy of nondisclosure of work products. The Commission concluded that:

* * * [I]t was not the intention of Dr. Wilkinson to include Royce Area 617 at the time he signed the stipulation in Case 46640. There is no evi-

dence as to the intention of the attorneys who signed the stipulation on behalf of the government * * *. [21 Ind.Cl.Comm. 268, 275 (1959).]

This additional evidence is therefore factually insufficient; it is also legally insufficient. This is due to the well-settled doctrine that parol evidence cannot be admitted in collateral proceedings to vary or explain judgments or judicial records. A stipulation such as was entered in No. 46640 is an act of the court and has the same force and effect as all judgments. Nashville, Chattanooga & St. Louis Ry. v. United States, 113 U.S. 261, 5 S.Ct. 460, 28 L.Ed. 971 (1885); NLRB v. Ochoa Fertilizer Corp., 368 U.S. 318, 323, 82 S.Ct. 344, 7 L.Ed.2d 312 (1961); Mason v. United States, 169 F.Supp. 507, 144 Ct.Cl. 579 (1959).

The reason for and importance of this doctrine was set out by this court in an earlier case, Utah Power & Light Co. v. United States, 70 Ct.Cl. 391, 42 F.2d 304 (1930):

> * * * If, by reason of the decree having been entered by consent, the judgment which forms part of it is not in fact an adjudication of the issues in the case in accordance with its recitals, then in all the numerous cases in which final decrees have been entered by federal courts [on stipulation] in accordance with the agreement between counsel for the government and counsel for the other party to the action, the decree is not binding upon the parties, and becomes of no force and effect. The establishment of such a doctrine, * * *, would not only surprise the legal profession generally, but render a final settlement of cases pending in courts practically impossible. [*Id.* at 397–398, 42 F.2d at 307.]

The case should never have been remanded to the Commission for this purpose and I regret that I did not dissent from the decision to do so. This remand was an open invitation for a collateral attack on our 1950 judgment, which is not permissible and made it appear that our court did not know what it was doing when it entered the 1950 judgment settling, comprising, and paying all of appellees' claims of every kind and character regarding all of its lands ceded to the United States in 1880, which included the land in suit.

But, says the majority, the Indians [1] should still recover, on the theory, itself quite anomalous, that the Act of 1880 was somewhat ambiguous, and, therefore, the subsequent governmental acts and Acts of Congress can be looked to to determine ownership of the lands in question. This argument is not only a contradiction of the facts and circumstances of this case, but also violates the principle of *stare decisis*.

Primarily, the Act of 1880 is not ambiguous. Its terms clearly indicate that the title to all lands embraced by the Act, and not allotted to the individual Indians, is released and conveyed to the United States. The surplus land involved in this case, land remaining after allotments to individual Southern Utes were made, was, therefore, not the property of the Indians, but of the United States. As we have stated earlier, the language in case No. 46640, " * * * any land formerly owned or claimed by the plaintiffs in western Colorado, ceded to defendant by the Act of June 15, 1880 * * *," is *descriptive* language. The court in 1950 had no other convenient method of describing the land, so reference was made to it in the best terms available, namely, as all land included in the Act of 1880. Since the lands at bar were not allotted to individual Indians in accordance with the 1880 Act, title to them was therefore released and conveyed to the United States. Therefore, the lands at bar fell squarely within the stipulation in case No. 46640.

---

1. A judgment in this case will doubtless reach into the millions, as did the judgments in 1950. The current population of the Southern Ute Tribe is around 660.

(Dept. of Interior, Bureau of Ind. Aff.; "Estimate of the Indian Population Served by the Bureau of Indian Affairs: 1968".)

This being the case, the subsequent acts of the government are without legal effect as far as the facts of this case go. Two reasons make this conclusion mandatory. First, assuming for the sake of argument that governmental acts subsequent to 1880 were confusing, *still* the lands in question were conveyed to the United States by the Act of 1880. Second, a correct reading of the Acts of 1882 and 1895 show that these Acts made absolutely no change in the Act of 1880. I have already explained these Acts, and will not repeat myself. Suffice it to say that there are no words of cession or reservation in these later Acts (as regards the land at bar), and, therefore, title remained in the government in accordance with the Act of 1880, and did not go to the Southern Utes. The Indians' supposititious belief that they owned the land is of no legal importance, and it is surprising that the majority would believe Ute Indian Buckskin Charlie instead of the Congress of the United States. This is not a contract case where detrimental reliance comes to play; nor, for that matter, have the Indians suffered to their detriment by mistakenly believing they were the owners of the land they ceded away. And, any subsequent confusion on the behalf of changing government officials does not and cannot change the binding legal effect of the Act of 1880. Rather, it only goes to show that the Indians' stalling tactics were partially effective, and that time dulls the inattentive senses of changing governmental officials as well as of Indians.

The majority places weight on the fact that the Act of 1895 was negotiated solely with the Southern Utes. Fifteen years had then elapsed since the 1880 agreement, and the government desperately needed to get this matter settled. Therefore, it used what means it deemed expedient to convince the Southern Utes to take allotments, or move to the site of the present Ute Mountain Reservation. This meant negotiating directly with the Southern Utes, and paying the proceeds of the land held in trust directly to them.

This was a mere gratuitous windfall to the Southern Utes, and any harm done here was to other tribes of the Confederated Bands of Utes. Furthermore, even if we accept for the sake of argument the majority's position, nothing done in 1895 took the lands presently in question out of the *descriptive phrase "lands ceded in 1880."* Even if the majority's position regarding the Act of 1895 is true, the lands at bar were still within the terms of the stipulation, since they were originally part of the lands ceded in 1880, and, therefore, any claims pertaining to these lands have been disposed of and settled.

To document the fact that the lands presently before us were indeed ceded by the Indians to the government in 1880, we need only pay heed to the doctrine of *stare decisis*, and examine earlier cases decided by this court which dealt with and interpreted the Act of 1880. Each of these cases involved the Act of 1880, and what lands were embraced therein, and in each case the question of what lands were involved in the Act of 1880 was clearly before the court for decision.

The first case to arise out of the Act of 1880 is The Ute Indians v. United States, 45 Ct.Cl. 440 (1910). This was an accounting case for the proceeds of all cash sales of land ceded by the Indians to the United States under the Act of 1880, up to 1910. The printed record of the case (Def's Ex. 14a and 14b) establishes beyond a doubt that lands from Royce Area 617 (the lands presently before the court) and Royce Area 616 were included in the final judgment of this case, since these lands were within the 1880 cession to the government. In the Memorandum in re the Confederated Bands of Indians v. United States, Cause No. 30360, at page 634 (Def's Ex. 14a), the following excerpt is right to the point:

The area of lands sold during the fiscal year 1908, as first stated, was 112,158.94 acres, while the cash received therefor is $90,219.93. (Record p. 355.) The explanation is that part of this land has been sold, under the Act

approved February 20, 1895 (28 Stats., 677), [i. e., opened under the homestead laws] being surplus lands on the Southern Ute Reservation, partly on deferred payments. *These lands are embraced within the cession of 1880 and within the accounting under the jurisdictional act.* [Emphasis supplied.]

In the opinion of the court in the case, Judge Barney wrote:

In compliance with the provisions of the act [of 1880] all of the plaintiffs were removed to Utah, and allotments were there made to them, except the southern Utes who remained upon the reservation [of 1868] and received allotments along and within its southern border and partly within New Mexico. * * *. [*Id.* at 461.]

The Judge also wrote:

By that agreement [of 1880] the plaintiffs ceded to the United States *the entire remainder of their reservation* * * * and agreed to remove, settle upon, and accept individual allotments of unoccupied agricultural and grazing lands in *certain designated localities* * * *.

It was further agreed by section 3 of said act that *all lands within the ceded limits not allotted in severalty* to the plaintiffs should be *deemed to be public lands of the United States* * * *. [Emphasis supplied.] [*Id.* at 459–460.]

Also included in this 1910 case was an accounting for land taken for the San Juan National Forest. This land was within Royce Area 617, the land area presently before the court, and was held by the court in 1910 to be land embraced by the cession of 1880.

Appellees have failed to distinguish this case, or to show that an error was made by the court in 1910. The majority's opinion likewise fails to follow this case, or to deal with it.

The next case involving the Act of 1880 to come up was Confederated Band of Ute Indians v. United States, 100 Ct. Cl. 413 (1943), which dealt with the re-

maining undisposed of lands in Royce Area 616; therefore, the Act of 1880 was again before the court. This case arose after the 1938 "restorations." (By way of explanation, in 1938 by Act of Congress, the remaining undisposed of lands in Royce Area 616 were declared to be the property of the United States, while the remaining lands in Royce Area 617 were restored to tribal ownership.)

In the Reporter's Statement of the Case, we find the following:

By the agreement ratified, confirmed, and amended in the Act of June 15, 1880, which was in turn accepted and ratified by plaintiffs, plaintiffs *ceded to defendant all territory* in Colorado then reserved for their use, *after the allotment* of certain lands to individual members of plaintiff bands as provided by said agreement. * * * [*Id.* at 416.] [Emphasis supplied.]

This is a correct interpretation of the Act of 1880.

The Reporter also set out the terms of the restoration of Royce Area 617:

* * * [T]he Secretary of the Interior purported to restore certain lands in the southern portion of the area ceded in the Agreement of 1880 to the "Ute Mountain Band of Ute Indians of the Southern Ute Indian Reservation in Colorado," and to the "Confederated Bands of the Ute Tribe of Indians, Colorado," respectively. [*Id.* at 419.]

The fact that the land was *restored* to Southern Utes and other tribes of the Confederated Bands is convincing evidence that the Southern Utes did not retain ownership of these lands, because you cannot restore land if it was never ceded away.

Judge Madden, writing for the majority, construed the Act of 1880:

On March 6, 1880, an agreement was made by the chiefs and headmen of the Utes, which was later ratified by the members of the tribes, *to cede their remaining lands in Colorado to the United States,* after first providing for

certain individual allotments to some members of the tribes. * * * [Emphasis supplied.] [*Id.* at 421.]

Here is another clear holding by this court that the lands presently in question were a part of the lands ceded by the Indians to the government in 1880.

In 1948, the court heard a suit to determine which lands were taken and the value thereof within the terms of the 1943 judgment. Confederated Bands of Ute Indians v. United States, 112 Ct.Cl. 123 (1948). The court accepted the 1943 construction of the Act of 1880. The Indians have failed to distinguish this case.

The next litigation involving the Act of 1880 is the 1950 case, Confederated Bands of Ute Indians v. United States, 117 Ct.Cl. 433 (1950), in which four causes (Nos. 45585, 46640, 47564, 47566) were settled. It is of course my contention that cause No. 46640 settled the claims on which the Indians are presently suing.

Soon after the 1950 case, the court heard a suit for attorneys' fees for services rendered to the Confederated Bands which resulted in the 1950 decision. Confederated Bands of Ute Indians v. United States, 120 Ct.Cl. 609 (1951). The very law firm which is now in court representing the Southern Utes in this case was bringing suit to determine the value of its services. Findings of Fact No. 25(b) from that case is another answer to the case before us, and, I would suggest, an answer to which plaintiffs now before us are specially bound. The court found:

25. (a) * * *

(b) The original Ute reservation, established by treaty between the Indians and the United States in 1868, embraced 15,000,000 acres on the western slope of Colorado. In 1873 the Indians ceded to the United States a segment in the southern part of the reservation containing 3,000,000 acres. *In 1880 the Indians ceded to the United States the remainder of the reservation, containing 12,000,000 acres.* [Emphasis supplied.] [*Id.* at 623.]

In every single case which has come before this court involving the Act of 1880, this court has found that the Act ceded to the United States *all* of the lands in the former Ute Reservation in Colorado, excepting only the land transferred to individual Indians as allotments. The majority ignores these cases as if they were not in the books. In its zeal to compensate the living Indians for the claimed harm done their ancestors, the majority loses sight of the fact that the Indians have already been amply reimbursed for the land at bar in 1950. The Southern Utes may have sincerely believed that this land was theirs, but Indians too can be wrong. In another case in which the Utes were plaintiffs (involving different land), the Supreme Court set out the long established rule governing the interpretation of treaties, acts, and agreements between the Indians and the United States:

* * * While it has long been the rule that a treaty with Indians is to be construed so as to carry out the Government's obligations in accordance with the fair understanding of the Indians, we cannot, under the guise of interpretation, create Presidential authority where there was none, nor rewrite congressional acts so as to make them mean something they obviously were not intended to mean. Choctaw Nation v. United States, 318 U.S. 423, 431, 432, 63 S.Ct. 672, 677, 678, 87 L.Ed. 877. We cannot, under any acceptable rule of interpretation, hold that the Indians owned the lands merely because they thought so. Solicitous as the Government is to carry out its promises to the Indians in good faith, we are satisfied from this record that the Government has performed all that it promised. [Confederated Bands of Ute Indians v. United States, 330 U.S. 169, 179–180, 67 S.Ct. 650, 655, 91 L.Ed. 823 (1947), aff'g, 64 F.Supp. 569, 106 Ct.Cl. 33 (1946).]

I am satisfied that in the case before us the government has performed all it

promised and has already paid the Indians for their present claim.

It should be pointed out that when the four cases (Nos. 45585, 46640, 47564 and 47566) were settled in Confederated Band of Ute Indians v. United States, 117 Ct.Cl. 433 in 1950, the settlement was one of pure compromise of all the claims of the Ute Indians. The agreement of settlement was not reached quickly. In fact, negotiations for compromise and settlement extended over a period of three years. The government first offered the sum of $14,000,000, plus interest, less offsets, in full settlement. This was refused by the Utes. The government then offered $20,000,000, including interest, less offsets, which was refused.

The Utes' attorneys demanded $30,000,000 in settlement of all the claims and cases. Finally, the parties agreed to a compromise settlement of $20,000,000, plus interest, amounting in all to the sum of $31,938,473.43. This amounted to $15,600 for each Indian. The parties then entered into a joint stipulation and judgment of compromise and settlement of all claims and demands, right, title, interest, and estate of whatsoever nature in and to the land in western Colorado ceded by the Ute Indians to the United States by the Act of June 15, 1880. All of these negotiations are shown in the opinion of this court in the case of Confederated Bands of Ute Indians v. United States, 120 Ct.Cl. 609 (1951) in which the attorneys were asking this court to allow them an attorney fee of $3,193,847.-35.[2] They alleged in great detail all the work they had done, which was considerable, how they had negotiated for the compromise and settlement and how long it took to reach a settlement agreement. The significance of all of this is to show that the settlement was a lump sum compromise in the nature of a jury verdict for *all* the claims of the Ute Indians with reference to the land ceded in 1880 (including the land involved here). It did not matter what land was listed in Sched-ule 1, nor whether or not all of it was listed, nor whether the listing was correct. The Indians make a great deal to do over their claim in this case that no land in Royce 617 was listed in the Schedule. This is immaterial, because the stipulation of the parties and judgment stated it was in *full* settlement and payment for the *complete extinguishment* of plaintiffs' claims *of whatsoever nature* in and to the lands ceded in 1880, *whether listed in Schedule 1 or not,* and plaintiffs' petition was deemed amended to conform to the stipulation.

The Indians and their attorneys are estopped to attack or impeach their own stipulation and judgment which they signed and accepted and for which they have been paid. Davis v. Wakelee, 156 U.S. 680, 689–690, 15 S.Ct. 555, 39 L.Ed. 578 (1895); Livesay Industries, Inc. v. Livesay Window Co., 202 F.2d 378, 382 (5th Cir. 1953), cert. denied, 346 U.S. 855, 74 S.Ct. 70, 98 L.Ed. 369; American Nat'l Bank & Trust Co. v. Taussig, 255 F.2d 765, 769 (7th Cir. 1958), cert. denied, 358 U.S. 883, 79 S.Ct. 125, 3 L.Ed. 112. This settlement was payment for, and an accord and satisfaction and release of, all of their claims, including those before us in the instant suit. I mention the attorneys because this court must fix their attorney fees, as it did in the previous case, as an amount not exceeding 10 percent of the recovery. They shared in the previous recovery on a contingent fee basis and will share in this one on the same basis. I consider that under the circumstances they are bound by the stipulation, settlement, and judgment in 1950 to the same extent that the Indians are bound.

*Lack of Necessary Parties Plaintiff*

There is another fatal flaw in the Indians' side of the case before us, a flaw which requires a reversal of the decision in this case. This is because there is a lack of necessary parties before the court.

2. The sum of $2,800,000 was allowed.

First, it should be observed that any claim that the White River, Uncompahgre or Uintah Utes might have had was lost in the following Resolution of June 1, 1950. (Def's Ex. 18. This resolution was accepted by Congress and carried into effect by section 2 of the Act of August 21, 1951, 65 Stat. 194.)

(3) * * * [T]hat the Southern Ute Band (including the Ute Mountain Utes) shall foreover possess and own their Reservation [this included the Ute Reservation established west of Range 13 by the Act of 1895 and the residue lands (unallotted, unsold and not taken for the San Juan National Forest) east of range 14 which were restored to tribal ownership by order of the Secretary of the Interior of September 14, 1938] free from any claim of the Ute Indian Tribe of the Uintah and Ouray Reservation * * *.

(4) * * * [T]hat neither the Southern Utes (including the Ute Mountain Utes) nor the Uncompahgre, White River or Uintah Utes shall have any claim against each other for the past distribution of funds or allocations of land; * * *.

The fatal lack of parties, however, involves the various original signatories to the Agreement of 1895. The Southern Utes before the court cannot recover, because the present day Ute Mountain Utes, who are a part of the Southern Ute Tribe, are not parties to the suit.

At the time of the passage of the Act of 1895, there were three bands known collectively as the Southernn Utes; the Muaches (or Moaches), the Capotes and the Weeminuches. As I have said above, by the Act of 1895, one group of Indians chose to move to a reservation in western Colorado and New Mexico, and the other Indians chose to take individual allotments in the eastern portion of Royce Area 617. The group refusing allotments, which moved to the new western reservation, was composed mainly of Weeminuches (see appellees' brief at 13–14), and became known as the Ute Mountain Tribe, and were officially so recognized in 1940. The individual Indians who took allotments in the east were mainly Capotes and Muaches and are the appellees now before the court.

The Act of 1880 moved the Capotes, the Muaches and the Weeminuches (under the collective name of the Southern Utes) to the land area now in question for the purpose of taking allotments. Then, in 1895, some moved to the site of the present Ute Mountain Reservation in the west and some took allotments in the east. (It should be noted that the appellee Southern Ute Tribe had no official reservation until 1938, when the residue of unsold and unallotted lands in Royce Area 617 was restored to tribal ownership by order of the Secretary of the Interior. Prior to 1938, the only possessory interest any of these Southern Utes held in any land was their individual interest in their individual allotments.)

Under section 5 of the Act of 1895, all of the bands of the Southern Utes, including the present day Ute Mountain Tribe and the appellees, shared in the special benefits from the lands to be sold after the allotments. (See 28 Stat. 677, 678.) The Act even specifically set aside, out of the first moneys realized, an amount to be paid to "Buckskin Charlie, as chief of the Moaches, and *Mariano, as chief of the Weeminuches,* [who was of the Ute Mountain tribe] * * * [and] to Tapucke and Tabewatch, as chiefs of the Capotes * * *."

It is perfectly clear that the only property granted appellees' ancestors were the allotments, and the only property granted the ancestors of the present Ute Mountain Tribe was the land which is now the Ute Mountain Reservation. And the right to the proceeds from the remaining lands sold (the basis of this case) was granted to *all* of the Southern Utes (ancestors of the present Southern Ute Tribe and Ute Mountain Tribe) by the Act of 1895. Therefore, the Ute Mountain Tribe, not a party to this suit, has an interest in every claim arising from this land. Appellees' failure to join them results in a fatal lack of necessary parties.

In their brief, appellees attempt to deal with this serious problem within the space of three paragraphs (see brief at 13–14). To put it mildly, the reasoning and statements set forth are pure fantasy. Appellees say that the Act of 1895 was, "In effect, * * * a cross-relinquishment of rights between the allotted and unallotted Southern Utes * * *." This is simply wishful thinking, and is plainly contradicted by the specific terms of the Act of 1895, which gives the benefits and proceeds from the Act to *all* Southern Utes, both allotted and unallotted. There is neither in effect, nor in fact, nor in law any such "cross-relinquishment" of rights. The brief then says that "the unallotted Southern Utes surrendered their interest in the eastern portion of 'their present reservation' and the allotted Southern Utes surrendered their interest in the western portion." This again is simply fantasy. The Act of 1895 reserves the rights of *all* Southern Utes (Weeminuches, Capotes and Muaches, or, present day Ute Mountain Tribe and Southern Ute Tribe) to the proceeds of the sale of remaining lands.

Appellees then say, "The Southern Utes accepted this separation and two land-owning groups, each with its own reservation, were created. Through the voluntary cross-relinquishment of their interests under appropriate legislation, the allotted Southern Utes became the sole owners of the eastern part of the Southern Ute Reservation." (Brief at 14.) First, two land-owning groups, each with its own reservation, were *not* created. The only interest the allotted Indians held in the land was in each individual allotment. No reservation in the eastern part of Royce Area 617 was created; to the contrary, only individual allotments were created. Second, neither through a hypothetical "cross-relinquishment," nor through "appropriate legislation" (it is interesting to note that we are not cited to any of this "appropriate legislation"), did the present day Southern Utes become sole owners of the eastern part of Royce Area 617. To the exact contrary, the present day Southern

Utes became owners only of individual allotments, and the remaining land was held by the government, with the proceeds to go to all of the Indians, Weeminuches, Capotes and Muaches, regardless of whether they lived on the new Ute Mountain Reservation, or on an allotment.

I do not agree with the hindsight approach of the majority to this problem by its reliance on and interpretation of Rule 62(a) of this court. This rule applies only to suits originally filed in this court. The case before us is not such a case, but is one that was filed originally with the Indian Claims Commission, which has its own rules, and we are hearing the case on appeal. Not only that, but this court has its own separate rules for Indian cases it hears on appeal, adopted in 1948, entitled "Rules of the Court of Claims of the United States Governing Appeals from the Indian Claims Commission." Consequently, Rule 62(a) does not apply. In any event, the interpretation of this rule by the majority renders it meaningless. They say, in effect, that the rule means that an outside third party who may not even know the suit is pending, must affirmatively and timely intervene (file a claim) and, if he does not do so, the rule is satisfied. This is not what the rule says. It states in unequivocal language:

> * * * [P]ersons having a joint interest adverse to the United States, *shall be made parties* and *shall be joined* on the same side as plaintiffs. When any person who should join as a plaintiff refuses to do so, he may be made an involuntary plaintiff. [Emphasis supplied.]

As may be seen, this rule provides that persons having an interest "shall" be made parties and "shall" be joined as plaintiffs. This is compulsory and not optional. Also, the rule, where it is applicable, contemplates that persons having an interest *at the time the suit is filed* shall be joined. This suit was filed August 10, 1951, at a time when the Ute Mountain Indians of the Southern Ute Tribe unquestionably had an interest

in the claim. Under Rule 62(a), if it applies, they should have been made parties by the appellees at that time, and because of the failure to do so by appellees, there was and is a fatal lack of necessary parties in this case. But, the majority, with its hindsight approach is applying the rule as of now, 18 years after the suit was filed, saying, in effect, it would do no good to make them parties now because limitations has run on their claim, and, therefore, Rule 62(a) is satisfied and the present plaintiffs, notwithstanding their failure to comply with the rule, is in the position of "winner take all," including the interest of the Ute Mountain Indians. I cannot agree with this interpretation of the rule.

But, the problem does not end here. The Commission itself said that if the Utes ceded their entire Colorado Reservation in 1880, "then the present day Ute Mountain Utes as well as the remainder of the Confederated Utes would have been necessary parties." [3] Of course, as shown by the foregoing, this is exactly what happened. The Utes did cede all their remaining reservation to the United States in 1880. Therefore, the Ute Mountain Utes were necessary parties.

There is another reason not mentioned by the government why the Ute Mountain Utes are necessary parties to this suit. I refer to the fact that this suit was filed by the Southern Ute Tribe or Band of Indians. There is no question but what the Ute Mountain Utes, who live in the west, are as much a part of the Southern Ute Tribe or Band of Indians as the other Indians who live in the east (of Royce 617). I see nothing to prevent the Ute Mountain Utes from suing the United States, after payment of the judgment being awarded to the present appellees by the Commission and by the majority in this case, on the theory that since they are a part of the Southern Ute Tribe or Band of Indians, this suit was maintained for their benefit and the government has paid their part of

the recovery to the wrong parties, namely, the Southern Utes who live in the eastern part of Royce 617. In that case, the government would have the obligation of paying the claims for this land not only twice, but *three* times. The situation finally gets ridiculous. This problem is not cured by the allegations and contentions of the present plaintiffs to the effect that they are the sole owners of the claim, because the Ute Mountain Indians of the Southern Ute Tribe have had no notice of this suit and could not be bound by allegations of the plaintiffs unknown to them. They could, with sound reason, dispute this claim of the present plaintiffs and would no doubt do so if they had notice of this suit and were parties to it.

As late as 1951, the Congress considered the Ute Mountain Utes to be a part of the Southern Ute Band as shown by the resolution carried into effect by section (3) of the Act of August 21, 1951, 65 Stat. 194, quoted above, which contained the provisions "(3) * * *

[T]he Southern Ute Band (*including the Ute Mountain Utes*)" and again in section (4): "* * * [T]he Southern Utes (*including the Ute Mountain Utes*)." [Emphasis supplied.] There is no question but what the Ute mountain Utes were as much a part of the Southern Ute Tribe as were the present appellee Indians, and they were necessary parties to this lawsuit. It is difficult to see how one could reach a different conclusion.

The appellees have completely failed to sustain their contention that they are the sole owners of the claims in suit. Perhaps it is natural that they have failed in this respect, because it would have been impossible for them to prove otherwise, since in reality they are not the sole owners of the claims in suit.

The claim stated in the appellees' petition, filed August 10, 1951 (before the expiration of the time for filing claims

3. 17 Ind.Cl.Comm. 28, 52.

under the Indian Claims Commission Act), sought an accounting for:

    c.  Defendant's failure to account for the proceeds from approximately 81,-953.18 acres * · * * was in violation of the aforesaid statutes [of 1880 and 1895] * * * and caused damage to petitioner in an amount equal to that received by defendant, which amount is unknown to petitioner, but is known to defendant.

    d.  Defendant's failure to account for the proceeds from the sale of approximately 81,953.18 acres constituted unfair and dishonorable conduct on the part of defendant, and caused damage to petitioner in an amount equal to that received by defendant * * *.

As this is no more than a claim for proceeds from sales, this claim has already been settled by the stipulation case No. 46640 (117 Ct.Cl. 433, 436 (1950)).

The additional accounting claims, which deal principally with mismanagement of trust funds (see Def's brief at 81–86 for complete listing), were inserted in the case in 1963 by way of filing exceptions. This was long after the 1951 expiration date of the Indian Claims Commission Act (25 U.S.C. § 70k). When the tribe presented these additional claims, defendant objected strenuously that the claims were beyond the scope of the initial claim, and, therefore, their admission was violative of the Supreme Court's ruling in United States v. Seminole Nation, 299 U.S. 417, 57 S.Ct. 283, 81 L.Ed. 316 (1937), wherein the court said that after the time allowed in a jurisdictional act has run out, amendments may only supply details, but may not bring in additional claims. (This holding followed in Seminole Nation v. United States, 316 U.S. 286, 288–289, 62 S.Ct. 1049, 86 L.Ed. 1480 (1942).) The claims filed in this suit in 1963 are obviously beyond the scope of the original claim filed in 1951.

The Commission seems to concede that the new claims asserted went beyond the original claim, when it said:

Defendant's objection goes specifically to the fact that petitioner has requested an accounting in its petition for certain specific items and has now raised by means of the exceptions * * * certain general accounting claims not referred to in its petition. [17 Ind.Cl.Comm. 28 (1966).]

But the Commission attempts to get around this by applying a rule sounding in equity, that the tribe did not know how its funds had been mishandled within the time allowed, and that this knowledge came to light only after the appellees received the GAO report in the case. Even if this statement was factually correct, it could not extend the jurisdiction of the Commission, for the enabling Act reads:

The Commission shall receive claims for a period of five years after August 13, 1946, and no claim existing before such date but not presented within such period may thereafter be submitted to any court or administrative agency for consideration, nor will such claim thereafter be entertained by the Congress. [25 U.S.C. § 70k (1964).]

But further, the evidence in this case shows that GAO reports covering the handling of the funds had been submitted to the Utes' counsel as early as June 1949 (report in case No. 46640), and February 1953. Although the latter GAO report, the report in this case, was submitted in 1953, it was not until 1963 that counsel for the Southern Utes filed these exceptions. Not only was the late filing barred by limitations due to the Indian Claims Commission Act quoted above, it was also barred by the equitable doctrine of laches.

*Conclusion*

In my opinion, in accordance with section 20 of the Act creating the Indian Claims Commission (25 U.S.C. § 70s(b) (1964)), I would hold that the findings of fact of the Indian Claims Commission in this case are not supported by substantial evidence, and especially its findings that the Confederated Bands of Ute

Indians did not cede their remaining lands in their Reservation to the United States in 1880; that the Ute Mountain Utes in the west of Royce 617 are separate from the Southern Ute Tribe in the east; that the lands involved in this case were not included in the settlement of 1950 and that the parties did not so intend; that a proper accounting has not been made by the government to the appellees. I would also hold that the conclusions of law stated by the Commission as a basis for its final determination are not valid and are not supported by its findings of fact for all of the reasons stated herein. This is particularly true with reference to its conclusions of law that the Ute Indians did not cede all their remaining lands to the United States by the Act of 1880; that the subsequent Acts of 1882, 1888, and 1895 restored and vested the lands involved here in the Southern Utes in the eastern part of Royce 617 and to the exclusion of the Ute Mountain Utes; that said lands were not included in the 1950 settlement and the appellee is now entitled to be paid for it; that *res judicata* does not apply and that the Ute Mountain Utes are not a part of the Southern Ute Tribe and consequently have no claim and are not necessary parties.

Both the majority and the Commission ignored and ruled contrary to the following well-established principles of law in allowing the plaintiff Indians to recover in this case:

1. *Res judicata.*
2. *Stare decisis.*
3. Compromise and settlement.
4. Payment.
5. Accord and satisfaction.
6. Release of all claims.
7. Collateral attack on the 1950 judgment.
8. Disregarding the 1950 judgment of this court when no direct attack has been made on it.
9. Estoppel of the Indians to impeach their own act in executing the stipulation, settlement, and judgment of 1950.
10. Varying the terms of the written stipulation and judgment of 1950 by the parol evidence of Attorney Wilkinson 19 years later as to his intention.
11. Lack of necessary parties plaintiff.
12. Limitations and lack of jurisdiction as to the accounting claim.
13. Lack of substantial evidence.
14. Erroneous conclusions of law.

Seldom do you find a case where so many bulwark principles of law have been ignored, by-passed, and violated. In my opinion, the decision should not stand.

I would reverse the decision of the Commission and enter judgment for the defendant.

COWEN, Chief Judge (dissenting):

Although I cannot join in a number of the observations made in his dissenting opinion, I am persuaded that Judge Skelton has accurately analyzed the purpose and effect of the Act of 1880 and subsequent acts involved in this appeal and has correctly concluded that appellee's right to recover is precluded by the judgments entered by this court in 1950 in the four cases (Nos. 45585, 46640, 47564, and 47566), Confederated Bands of Ute Indians v. United States, 117 Ct.Cl. 433 (1950).

I also agree with Judge Skelton that this court erred in remanding the case to the Indian Claims Commission to determine the intention of the parties in executing the stipulation on which the judgment in Case No. 46640 was based. If such a collateral attack on the judgment entered in that case were permissible, I would readily concur with the court's holding that the proceedings before and the additional findings made by the Indian Claims Commission on remand, support the conclusion that the parties never intended that the stipulation included Royce Area 617. However, as clearly established by the authorities cited by Judge Skelton, the stipulation was the basis for the entry of a final judgment

which may not be re-opened or examined in such a collateral proceeding to ascertain the intent of the stipulating parties. Although our error—an error in which I participated—in remanding the case for that purpose is regrettable, it is not too late to acknowledge the error and to correct it.

I think it is much too late in the history of the Ute Indian litigation in this court to raise any doubt about the fact that the land, which is the subject of this appeal, was ceded to the United States by the Act of 1880. This court so found in each of its decisions discussed in Judge Skelton's opinion and the Supreme Court so construed the Act in Confederated Bands of Ute Indians v. United States, 330 U.S. 169, 67 S.Ct. 650, 91 L.Ed. 823 (1947), wherein the Court stated:

> There is not one word in that Act showing a congressional purpose to convey the Executive Order lands, or any other lands, to the Indians. On the contrary, the Act embodied a transaction whereby the Indians were the transferors and conveyed lands to the Government. For the value of lands so conveyed, and for no other, the Government was to make an account to the Indians after certain deductions had been made. [330 U.S. at p. 177, 67 S.Ct. at p. 654].

Moreover, the plaintiffs in the four suits (Nos. 45585, 46640, 47564, and 47566), filed pursuant to the Jurisdictional Act of June 28, 1938, 52 Stat. 1209, alleged that the land had been ceded to the United States. For example, paragraph 5 of plaintiff's petition in Case No. 46640 reads as follows:

> By agreement of March 6, 1880, which was amended, ratified and confirmd by Act of Congress of June 15, 1880, c. 223, 21 Stat. 199, 1 Kappler 180 (amended by Act of July 28, 1882, c. 357, 22 Stat. 178, 1 Kappler 205), plaintiffs ceded to defendant a vast area of land in exchange for which defendant among other considerations agreed, after the allotment of certain

lands to individual members of plaintiffs, to hold the balance of such lands in trust for cash entry (and not entry or settlement under the homestead laws), and to deposit the proceeds received from such sales, after certain stipulated payments, in the Treasury of the United States for the benefit of plaintiffs. The Agreement of March 6, 1880, as amended by the aforesaid Act of June 15, 1880, was ratified and approved by three-fourths of the adult male Indians of the Confederated Bands of Utes within the time limit fixed by Section 10 of said Act.[1]

Furthermore, it is not open to question that the Jurisdictional Act of June 28, 1938, pursuant to which the four suits settled in 1950 were filed, was intended to confer jurisdiction on this court to hear, determine and render judgment on all remaining claims, legal and equitable, which the Indians then had against the United States, whether the claims arose under the Act of 1880 or subsequent acts. The first section of the Act provides as follows:

> *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That jurisdiction is hereby conferred on the United States Court of Claims to hear, determine, and render final judgment on all legal and equitable claims of whatsoever nature which the Ute Indians or any tribe or band or any constitutent [sic] band thereof, may have against the United States, including, but without limiting the generality of the foregoing, claims arising under or growing out of any treaty or agreement of the United States, law of Congress, Executive order, or by reason of any lands taken from them, without compensation, or for the failure or refusal of the United States to protect the interest of any of said bands in lands (as to which any of said bands had the possessory right of use and occupancy), or be-

---

1. *See* Vol. 960, Printed Records, Court of Claims Term 1949.

cause of any mismanagement or wrongful handling of any of the funds, land, property, or business enterprises belonging to or held in trust for any of said bands by the United States, or any misfeasance or nonfeasance on the part of the United States with respect thereto, or otherwise.

I find nothing in the foregoing or elsewhere in the Act which suggests that the claim involved in this appeal was somehow reserved or excluded from the terms of the statute.

The Indian Claims Commission found that appellee is entitled to recover for the taking of 230,547.44 acres of land disposed of by defendant as free homesteads between 1899 and September 14, 1938, for interest due on the proceeds of the sales of appellee's land, and for an accounting as to the use of such proceeds.[2]

Plaintiff's petition in Case No. 45585 (the first of the four suits brought pursuant to the Act of June 28, 1938, and settled in 1950) was filed November 22, 1941, and plaintiff's petition in No. 46640 was filed October 15, 1945. Prior to the time these suits were filed in the Court of Claims the causes of action, upon which the Commission predicated defendant's liability to the appellee, had accrued and could have been included in the four suits. Moreover, the allegations of plaintiff's petition in Case No. 46640 were broad enough to include the claims for which the Commission held the defendant liable. In the amended petition filed in that case on March 19, 1947, plaintiffs alleged the following in paragraphs 6 and 7.[3]

6. By decree of this Court in a suit brought by plaintiffs in 1909 (The Ute Indians v. The United States, No. 30360), pursuant to a jurisdictional act of March 3, 1909, c. 263, 35 Stat. 781, 788, plaintiffs recovered judgment against defendant *for the proceeds of certain sales and other disposals of the aforesaid lands up to June 30, 1910.*

No relief is sought with respect to such sales and dispositions in this action, but relief is sought with respect thereto in Case No. 47566, filed in this Court on December 30, 1946.

By Executive Orders of December 6, 1916 and September 27, 1924, defendant withdrew and set aside 64,560 other acres of the aforesaid lands as naval oil reserves which lands are the subject matter of Case No. 47564, filed in this Court on December 30, 1946, and no relief is sought therefor in this action.

By Agreement of May 10, 1911, amended, ratified and confirmed by Act of June 30, 1913 (38 Stat. 77, 81–82), defendant conveyed 20,160 other acres of land subject to the aforesaid 1880 Agreement, together with other lands to the Weeminuche or Southern Ute Indians in partial exchange for lands from the then reservation of said Indians. Such lands are the subject of plaintiffs' claim in Case No. 47565, filed in this Court on December 30, 1946, and no relief is sought therefor in this action.

Since June 30, 1910, and prior to June 28, 1938, defendant made other and further sales and disposals of certain of said lands, by sales thereof for cash, by homestead or other entries under the public land laws for less than the agreed minimum price per acre, by setting apart and reserving such lands as national reservations or for other public uses, or by otherwise classifying, reserving, or withdrawing such lands from entry and sale under the public land laws. Plaintiff is advised, believes, and therefore avers that defendant has not accounted to plaintiffs for such cash sales or paid plaintiffs the minimum per acre price for lands entered under the homestead laws in accordance with the Act of July 28, 1882 (22 Stat. 178) or otherwise, nor paid plaintiffs the value of such lands

---

2. 17 Ind.Cl.Comm. 28, findings 10, 11, 19 and 20.

3. Plaintiff's amended petition in No. 46640, The Confederated Bands of Ute, Indians v. United States, Printed Records Court of Claims Term 1949.

set apart and reserved as national reservations or classified, reserved, or withdrawn from entry and sale under the public land laws. Defendant has never rendered to plaintiffs a true, complete and proper account with respect to said property of plaintiffs and said trust funds.

7. Wherefore plaintiffs pray that defendant make a full and true discovery and disclosure of acreage sold, homesteaded, or otherwise withdrawn for national reservations or for other public uses, or otherwise classified, reserved, or withdrawn from entry or sale under the Public Land Laws prior to June 28, 1938, and not heretofore paid for by defendant in connection with the suit by plaintiffs brought in 1909 as hereinabove paragraph 6 recited and not the subject of the actions pending in this Court which are referred to in paragraph 6 hereof; and that defendant be adjudged liable to plaintiffs for such sales and appropriations of lands in such amount as upon a complete and accurate accounting this court may find due and owing to the plaintiffs as reasonable and just compensation, but in no event less than the minimum price at which defendant has agreed to sell such lands.

All the judges of the court are agreed that the land now in issue was, in the language of the judgment entered in Case No. 46640, "land formerly owned or claimed by the plaintiffs in western Colorado, ceded to defendant by the Act of June 15, 1880 (21 Stat. 199), and by the defendant during the aforesaid periods of time * * * disposed of as free homesteads * * *." The preceding language of the stipulation—"the judgment to be entered in this case is *res judicata*, not only as to the land described in Schedule 1, but whether included therein or not"—is certainly sufficient to cover the land now in issue. Therefore, I see no way to avoid the conclusion that the final judgment entered in that case bars appellee's right to recover. The fact that the plaintiffs or their counsel had an undisclosed or unexpressed intention to exclude the land in controversy from the stipulation does not alter the conclusive effect of the judgment entered. United States v. William Cramp & Sons Ship & Engine Bldg. Co., 206 U.S. 118, 128, 27 S.Ct. 676, 51 L.Ed. 983 (1907); NLRB v. Ochoa Fertilizer Corp., 368 U.S. 318, 323, 82 S.Ct. 344, 7 L.Ed.2d 312 (1961); Utah Power & Light Co. v. United States, 42 F.2d 304, 70 Ct.Cl. 391 (1930).